UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 96-10320
_____


In The Matter of: SOUTHMARK CORPORATION,

Debtor.

SOUTHMARK CORPORATION,

Appellant,

versus

COOPERS & LYBRAND; THOMPSON & KNIGHT,

Appellees.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

January 11, 1999

Before JOLLY, JONES, and PARKER, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This appeal arises from a malpractice suit filed by Southmark Corporation ("Southmark") against Coopers & Lybrand L.L.P. ("Coopers"), the accountant to the court-appointed Examiner in Southmark's reorganization case under Chapter 11 of the Bankruptcy Code. Southmark filed suit in a Texas state court in April, 1995. Coopers removed the case to the bankruptcy court that

had presided over Southmark's reorganization. In an unusual twist, Southmark did not perceive the bankruptcy court as a beneficial forum, so it moved for the court's mandatory abstention, or alternatively, for discretionary abstention or remand. 11 U.S.C. §§ 1334(c) (1984). Coopers sought summary judgment, a motion the bankruptcy court granted while denying Southmark's challenges to the forum. On appeal, the district court affirmed. We hold that the state-law malpractice claim is a "core proceeding" in bankruptcy and that the bankruptcy court's earlier ruling requiring Coopers to disgorge part of its fees for breach of bankruptcy disclosure rules gives rise to issue preclusion but not necessarily to claim preclusion.

## I. BACKGROUND

Southmark Corporation was a real estate investment trust that sponsored private and publicly syndicated real estate partnerships during the early 1980's. From 1982 until 1989 (shortly before Southmark declared bankruptcy), Drexel Burnham Lambert, Inc. ("Drexel") served as Southmark's primary investment banker, underwriter, securities broker and investment and financial advisor. Drexel was the underwriter for various Southmark offerings of junk bonds and preferred stock, totaling more than $1 billion.

During this period, Drexel was ostensibly underwriting high-yield bond issues for companies with the understanding that

2

the companies would use the proceeds to purchase high-yield bonds from other Drexel clients. Southmark became involved in the Drexel scheme. In October, 1986, Southmark issued $400 million in junk bonds and $100 million in preferred stock and subsequently invested the bond proceeds and part of the preferred stock revenues in other junk bond securities.

As with many speculative ventures in the 1980's, the expanding balloon eventually burst. In April 1989, Southmark announced a $1 billion write-down of its asset values, wiping out shareholders' equity. A few months later, Southmark filed for Chapter 11 bankruptcy protection. Eventually, the holders of Southmark's public debt received approximately 5 cents on the dollar in cash and securities in the reorganized Southmark that were projected at the time to be worth as much as 13 cents on the dollar.

Shortly after filing bankruptcy, Southmark requested the appointment of an Examiner to provide an unbiased, independent assessment of the propriety and practicality of pursuing litigation against third-parties. The court-appointed Examiner applied to the bankruptcy court to retain Coopers as the Examiner's accountant. Coopers was expressly directed by the court to investigate, among other things, Drexel's dealings with Southmark. Coopers disclosed at the time of its retention that it did some accounting work for Drexel, but the firm failed to disclose either the kind and degree

3

of work it did for Drexel, or that Coopers did substantial auditing work for Drexel.

Drexel's parent company, reeling from reverses in the junk-bond market, filed bankruptcy in February 1990. Southmark alleges that Coopers did not satisfactorily investigate Drexel's exposure to claims based upon Southmark's ill-fated junk bond investments. A Coopers employee charged that he was removed from this aspect of the Southmark account when he recommended investigating claims against Drexel to his superiors and was ordered to desist because (unbeknownst to Southmark) Drexel was one of Coopers' largest accounting clients. In the end, Coopers submitted a report to Southmark that downplayed the viability of these particular claims against Drexel. Southmark elected not to pursue these claims by filing a timely proof of claim in the Drexel bankruptcy case.

Instead, Southmark focused its limited resources on seeking recovery against Michael Milken, the mastermind behind Drexel's junk bond operation, who, unlike Drexel, had not filed bankruptcy. Southmark developed claims against Milken that it asserts are identical to the claims it could have raised against Drexel if Coopers had completed its investigation. Southmark eventually reached a settlement agreement that could yield more than $20 million from the Milken settlement fund.

## II.  PROCEDURAL HISTORY

In April 1993, Galbally, then a Coopers employee, met with Southmark's general counsel and alleged that Coopers had thwarted his efforts to investigate the Drexel claims. Southmark thereupon filed a disgorgement motion in the bankruptcy court pursuant to FED. R. CIV. P. 60(b) and Bankruptcy Rule 9024, seeking reconsideration of the court's previous award of fees to Coopers for its work as the Southmark Examiner's accountant. After extensive discovery, briefing, and a hearing, the bankruptcy court awarded Southmark $585,042.48 in recovery from Coopers in a modified final order entered April 4, 1995.

Three days later, Southmark commenced the instant case in a Texas state court, alleging that Coopers held back from a full investigation of certain potential claims by Southmark against Drexel; failed to disclose this omission; and misrepresented its investigative efforts because Drexel was a large audit client of Coopers. Additionally, Southmark alleged that Coopers' failure to investigate deterred Southmark from pursuing potential claims against Drexel or filing a proof of claim in the Drexel bankruptcy. Southmark's state law causes of action for breach of contract, fraud, breach of fiduciary duty and negligent misrepresentation alleged that Coopers' conduct caused it to suffer damages, including the total fees it paid Coopers during its bankruptcy case

5

and the amounts it would have recovered on timely claims against Drexel.

Coopers answered the state court petition and then removed the case to the federal district court, which referred the action to the same bankruptcy court that had conducted Southmark's bankruptcy and the disgorgement proceeding.[1] Southmark filed a motion for mandatory abstention, or, in the alternative discretionary abstention or remand based in part on the argument that the state law action was a non-core proceeding and therefore, abstention was required under 28 U.S.C. § 1334(c)(2). Coopers moved for summary judgment. The bankruptcy court granted Coopers' motion and dismissed the action as barred by both collateral estoppel and res judicata; the court denied Southmark's abstention motion as moot without expressly addressing its merits.

On appeal by Southmark, the district court affirmed. Announcing its reasoning in open court, the district court found that Southmark's action presented a core proceeding and that the bankruptcy court had implicitly so found in its earlier order, and he affirmed the bankruptcy court's findings regarding preclusion. Southmark has appealed.

## III.  ANALYSIS

---

[1]Along the way, Coopers joined Southmark's former general counsel as a third-party defendant.

No factual findings of the bankruptcy court are contested on appeal. The conclusions of law of both the bankruptcy and district court are subject to *de novo* review. *Criswell v. Hensley*, 102 F.3d 1411, 1414 (5th Cir. 1997).

### A.    Southmark's Motion to Abstain

Lurking like a troll beneath a bridge, procedural complexities bedevil a straight path to analysis of this case. That the bankruptcy court has some kind of jurisdiction over this malpractice action against court-appointed professionals is not in doubt. But what the court can do with its jurisdiction depends first on whether the malpractice case is a "core" bankruptcy matter or one that is "related to" Southmark's reorganization case. If the suit against Coopers is merely "related to" bankruptcy, the bankruptcy court was required to abstain from hearing it. 28 U.S.C. § 1334(c)(2).[2] If, however, the controversy lies "at the core of the federal bankruptcy power," *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71, 102 S. Ct. 2858, 2870-71 (1982), the bankruptcy law permits but does not require

---

[2]The parties do not dispute that additional statutory criteria for mandatory abstention are met here. Those criteria include a state-law cause of action, no other basis for federal court jurisdiction, and the pendency of state court litigation that can timely adjudicate the claim. *See* 28 U.S.C. § 1334 (c)(2).

7

abstention.  28 U.S.C. § 1334(c)(1).[3]  The root issue is as simple -- and complex -- as that.

Three procedural obstacles must be cleared before the merits discussion can proceed.  First, although this court may review the bankruptcy court's decision not to abstain, our jurisdiction is an historical anomaly.  For bankruptcy cases commenced after the 1994 amendments to the bankruptcy law, decisions either to abstain or not to abstain are not, with very limited exceptions, reviewable on appeal.[4]  Southmark's case predates this amendment and was filed when decisions not to abstain were reviewable on appeal.[5]  The standard on appeal is abuse of discretion.  *In re Howe*, 913 F.2d 1138, 1143 n.6 (5th Cir. 1990).

---

[3]A court may discretionarily "abstain from hearing state law claims whenever appropriate 'in the interest of justice, or . . . comity with state courts or respect for State law.'"  *Gober v. Terra + Corp.*, 100 F.3d 1195, 1206 (5th Cir. 1996) (quoting 28 U.S.C. § 1334(c)(1)).

[4]28 U.S.C. § 1334(d) (1994).  "Any decision to abstain or not to abstain made under this subsection (other than a decision not to abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal or otherwise by the court of appeals...or by the Supreme Court....").

[5]28 U.S.C. § 1334(c)(2), enacted in the Bankruptcy Amendments Act of 1984, Pub. L. 98-353, July 10, 1984, 98 Stat. 333.  ("Any decision to abstain made under this subsection is not reviewable by appeal or otherwise.").  *See* 1 Collier on Bankruptcy (15th Ed.) § 3.01, at 3-74.  By negative implication, as *Collier*'s notes, decisions not to abstain are reviewable on appeal.  *Id.*

Second, we note, only to reject out of hand, Coopers' assertion that statutory abstention does not apply to cases removed to federal court on the basis of bankruptcy jurisdiction. 28 U.S.C. § 1452. There is no textual support in the statute for this position, only a handful of bankruptcy court opinions support it, and the vast majority of courts hold otherwise.[6] We endorse the majority rule.

Third, the bankruptcy court should have decided the jurisdiction/abstention issues before reaching the preclusion issues. *Marathon Oil Co. v. Ruhrgas,* 145 F.3d 211 (5th Cir. 1998) (en banc), *cert. granted*, 67 U.S.L.W. 3273 (U.S. Dec. 7, 1998) (No. 98-470). Its diffidence may understandably have been related to its uncertainty whether Southmark's claims invoke core or non-core jurisdiction. But no pussy-footing around is allowed on jurisdictional issues.

All of that said, the question is how Southmark's claims fit into bankruptcy jurisdiction. The progenitor of the current

---

[6]*See In Re United States Brass Corp*., 173 B.R. 1000, 1004 (Bankr. E.D. Tex. 1994) ("it is the majority opinion that abstention does apply to [removed] cases. . ."); *see also Robinson v. Michigan Consol. Gas Co., Inc*., 918 F.2d 579, 584 n.3 (6th Cir. 1990); *Williams v. Shell Oil Co*., 169 B.R. 684, 690 (S.D. Cal. 1994). *But see In re Branded Products*, 154 B.R. 936 (Bankr. W.D. Tex. 1993) (mandatory abstention is inapplicable to cases removed from state courts pursuant to 28 U.S.C. § 1452).

bankruptcy system is another *Marathon* case,[7] in which the Supreme Court struck down as constitutionally too far-reaching Congress's assignment of jurisdiction to non-Article III bankruptcy judges under the 1978 Bankruptcy Code. In *Marathon*, the debtor filed suit on a pre-bankruptcy state-law breach of contract claim. Justice Brennan, writing for the plurality, distinguished between "the restructuring of debtor-credit relations, which is at the core of the federal bankruptcy power" and the "adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case." 458 U.S. at 71, 102 S. Ct. at 2871. The narrowest construction of *Marathon*, that placed upon it by Chief Justice Burger's dissenting opinion, is this:

> a "traditional" state common law action, not made subject to a federal rule of decision, and related only peripherally to an adjudication of bankruptcy under federal law, must, absent the consent of the litigants, be heard by an "Art. III court" if it is to be heard by any court or agency of the United States.

*Id*. at 92, 102 S. Ct. 2882 (Burger, C.J., dissenting).

Congress, re-enacting bankruptcy courts' jurisdiction in the wake of *Marathon*, drew on the "core" terminology to describe matters or proceedings that are an integral part of the bankruptcy case. For present purposes, such core jurisdiction statutorily

---

[7]*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S. Ct. 2858 (1982).

includes "matters concerning the administration of the estate," 28 U.S.C. § 157(b)(2)(A) and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor ... relationship ...." *Id*. at § 157(b)(2)(O). The statute also permits bankruptcy courts to hear and determine other matters that are "related to" bankruptcy but are not "core" matters, subject to the ultimate authority of the district court.[8]

In this circuit, Judge Wisdom authored a significant opinion interpreting both *Marathon* and the post-*Marathon* jurisdictional amendments. *See In re Wood*, 825 F.2d 90 (5th Cir. 1987). *Wood* involved a lawsuit filed by a third-party against the debtor over shares of stock acquired by the debtor post-petition. Judge Wisdom distilled the formula for bankruptcy court jurisdiction thus:

> We hold, therefore, that a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case. The proceeding before us does not meet this test and, accordingly, is a non-core proceeding. The plaintiff's suit is not based on any right created by the federal bankruptcy

---

[8]"Related-to" matters are those which, being peripheral to the concerns of the bankruptcy case and based on extrinsic sources of law, require mandatory abstention. *See* discussion *supra* note 2. The bankruptcy court may make a recommendation to the district court on the disposition of related-to matters, but it may not enter judgment concerning them unless the parties expressly so consent. 28 U.S.C. § 157(c).

> law. It is based on state created rights. Moreover, this suit is not a proceeding that could arise only in the context of a bankruptcy. It is simply a state contract action that, had there been no bankruptcy, could have proceeded in state court.

*Id*. at 97 (footnote omitted).

Southmark contends that its claims against Coopers do not satisfy the *Wood* test for core bankruptcy jurisdiction. First, Southmark's claims arise under state, not federal law and involve the company's "private rights" against Coopers rather than a "restructuring of debtor-creditor relations." Second, Southmark contends, the action against Coopers is not "a proceeding that, by its nature, could arise only in the context of the bankruptcy case." *Id*.

Although Southmark is correct in focusing attention on *Marathon*, the post-*Marathon* jurisdictional provisions, and on *Wood*, its interpretation of core bankruptcy matters is too narrow. To begin with, the state law origin of Southmark's claims is not dispositive. The jurisdictional statute expressly provides that the applicability of state law to a proceeding is insufficient in itself to render it a non-core proceeding. 28 U.S.C. § 157(b)(3). This provision, as *Wood* explains, recognizes Justice White's sensible observation in *Marathon* that many truly bankruptcy issues, like the determination of the basis for creditors' claims, turn on state law. *Wood*, 825 F.2d at 96. That Southmark's claims against

12

the court-appointed accountant for its examiner arose under state law does not prevent them from involving core jurisdiction.

Southmark also disputes that its claims could arise "only in the context of a bankruptcy case," inasmuch as Southmark could have sued any accounting firm that worked for it on similar grounds of disloyalty, non-disclosure and malpractice. It is somewhat disingenuous for Southmark to attempt to pry these claims out of their bankruptcy setting. Southmark's petition alleges *inter alia* claims for breaches of fiduciary duty and of the contract whose terms were approved by the bankruptcy court. Southmark prays for actual damages including return of the entire $4 million fee it paid Coopers from money belonging to the debtor's estate. The fee award was both approved by the bankruptcy court and subjected to the bankruptcy court's later disgorgement order.

In this case, the professional malpractice claims alleged against Coopers are inseparable from the bankruptcy context. A *sine qua non* in restructuring the debtor-creditor relationship is the court's ability to police the fiduciaries, whether trustees or debtors-in-possession and other court-appointed professionals, who are responsible for managing the debtor's estate in the best interest of creditors. The bankruptcy court must be able to assure itself and the creditors who rely on the process that court-approved managers of the debtor's estate are performing their work,

13

conscientiously and cost-effectively. Bankruptcy Code provisions describe the basis for compensation, appointment and removal of court-appointed professionals, their conflict-of-interest standards, and the duties they must perform. *See generally* 11 U.S.C. §§ 321, 322, 324, 326-331. Although standards for the conduct of court-appointed professionals, the breach of which may constitute bankruptcy malpractice, are not comprehensively expressed in the statute, the Code need not duplicate relevant, also-applicable state law. It is evident that a court-appointed professional's dereliction of duty could transgress both explicit Code responsibilities and applicable professional malpractice standards. For instance, in *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242 (3d Cir. 1994), the professional malpractice allegations included the attorneys' failure to comply with court orders and to submit a plan of reorganization to the bankruptcy court. Award of the professionals' fees and enforcement of the appropriate standards of conduct are inseparably related functions of bankruptcy courts.

Supervising the court-appointed professionals also bears directly on the distribution of the debtor's estate. If the estate is not marshaled and liquidated or reorganized expeditiously, there will be far less money available to pay creditors' claims. Excessive professional fees or fees charged for mediocre or, worse,

14

phantom work also cause the estate and the creditors to suffer. Southland might retort that this concern for the general well-being of the debtor's estate is over-played -- technically, the liquidation of any claim that the debtor holds against third parties would enhance the debtor's estate as much as collection on a malpractice claim against court-appointed professionals. *Marathon* held, in fact, that a debtor's contract claim against a third party (which had not filed a claim in bankruptcy) was not within the bankruptcy court jurisdiction, even though successful prosecution of the action would enrich the debtor's estate. And in *Wood*, a dispute over shares of stock acquired by the debtor post-petition fell only within the related-to jurisdiction but not core bankruptcy jurisdiction. These cases are, however, distinguishable from a malpractice claim involving court-appointed professionals. In the *Marathon* and *Wood* situations, the claims that were being prosecuted could stand alone from the bankruptcy case. A malpractice claim like the present one inevitably involves the nature of the services performed for the debtor's estate and the fees awarded under superintendence of the bankruptcy court; it cannot stand alone.

Even more significant, the claim against Coopers is not just for malpractice, but for the value of the asset which Coopers was to assist Southmark in recovering. If Coopers had done the job

15

for which it was retained, according to Southmark's allegations, Southmark would have filed a claim in the Drexel bankruptcy and recovered a substantial sum for creditors.  The claim against Coopers may therefore be viewed as one to recover an asset of Southmark's estate that Coopers let slip away.

From yet another perspective, this is not just a malpractice case like any other professional malpractice litigation Southmark might pursue.  Instead, Coopers has filed administrative claims to obtain its fees in the bankruptcy court, and the debtor's action is similar to a counterclaim against Coopers.  Unlike essential parties in *Marathon* or *Wood*, Coopers is not a stranger to the bankruptcy case, and this malpractice claim may invoke the bankruptcy court's core jurisdiction to adjudicate and determine the extent of claims by and against Southmark's estate.  *See* 28 U.S.C. § 157(2)(B); *see generally Billing*, 22 F.3d 1242.

Although surprisingly few court of appeals cases have explored the boundaries of bankruptcy courts' core jurisdiction in the wake of *Marathon*, at least three decisions are premised on the understanding that professional malpractice claims against court-appointed professionals are indeed core matters.  *See Billing*, 22 F.3d 1242; *Walsh v. Northwestern Nat'l Ins. Co.*, 51 F.3d 1473, 1476 (9th Cir. 1995); *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 483 n.4 (6th Cir. 1992).  No appeals court

16

decision has held otherwise. In one case against a bankruptcy trustee to recover property that did not belong to the debtors' estate, the court rejected subject matter jurisdiction founded on either core or related-to-bankruptcy jurisdiction. *In re Guild and Gallery Plus, Inc.*, 72 F.3d 1171, 1173 (3d Cir. 1996).

Southmark's lawsuit draws into question Coopers' performance of its duties under court order, and it seeks in part to recover on the claim Southmark would have had against Drexel. For these and other reasons just discussed, we conclude that Southmark's case against Coopers is a core proceeding in bankruptcy. Because this is a core proceeding, the bankruptcy court had discretion whether to abstain from hearing it. We hold that the court did not abuse his discretion in declining to abstain.

## B.   Preclusion Issues

Southmark has already recovered damages of a sort from Coopers, in that the bankruptcy court ordered Coopers to disgorge over $550,000 of the fees it received as court-appointed examiner. The recovery, based on Coopers' failure to disclose its professional relationships with Drexel pursuant to 11 U.S.C. § 328(c), consisted of Drexel-related fees of $55,000, together with treble that amount as a penalty, plus reimbursement of Southmark's costs and attorneys fees in prosecuting the motion. Coopers

17

asserts that this recovery, which neither party appealed, provides a basis for either issue or claim preclusion against Southmark's current lawsuit. Preclusion rules deter repetitive and piecemeal litigation by preventing the relitigation of issues that have been finally decided and the assertion of claims covering transactions that have already been disputed in court. The criteria for issue and claim preclusion are different, however, and one rule may apply when the other does not. While we doubt that a basis for claim preclusion existed here, issue preclusion prevents Southmark from relitigating the cause of its failure to file a timely proof of claim in the Drexel bankruptcy.

### 1. Issue Preclusion

Issue preclusion, formerly known as collateral estoppel, applies when the following elements are met:

> (1) the issue at stake must be identical to the one involved in the prior action; (2) the issue must have been actually litigated in the prior action; and (3) the determination of the issue in the prior action must have been a part of the judgment in that earlier action.

*Recoveredge L.P. v. Pentecost*, 44 F.3d 1284, 1290 (5th Cir. 1995). Relitigation of an issue is not precluded unless the facts and the legal standard used to assess them are the same in both proceedings. *Id*. at 1291 (citations omitted).[9] The bankruptcy

---

[9]Southmark cites a fourth, "special circumstance" requirement for application of issue preclusion. *See Copeland v. Merrill Lynch*

18

court and the district court found that Southmark was bound by issue preclusion from asserting that Coopers' malpractice caused Southmark to suffer damages, as that issue had already been litigated and decided in the bankruptcy court disgorgement proceeding.

Southmark first argues that the relevant issues are not identical. The disgorgement proceeding only resolved whether Coopers' failure *to disclose a conflict of interest* caused Southmark to fail to file a claim against Drexel (the bankruptcy court concluded it did not). In the instant case, Southmark alleges that Coopers's failure *to adequately investigate* the viability of a claim against Drexel caused Southmark to fail to file a timely claim.

Coopers responds that the causation of damages issue is the same in the disgorgement proceeding and the instant case. We agree. It was undisputed that Coopers did not disclose to the bankruptcy court its significant auditing relationship with Drexel. In order to gauge the penalty for nondisclosure, the bankruptcy court had to assess whether Coopers' ethical conflict, reflected in nondisclosure of the relationship and inadequate investigation of

_____

& *Co. Inc*, 47 F.3d 1415 (5th Cir. 1995). If such a requirement applies in this case, a proposition we find highly questionable, Southmark has in any event failed to support it factually. *See Recoveredge,* 44 F.3d at 1290-91 n.12.

19

Drexel claims, led Coopers to downplay potential Southmark claims against Drexel and to discourage Southmark from pursuing its rights against Drexel. Southmark asserts that the issues are different because "Coopers could have failed to disclose its conflict of interest to the Bankruptcy Court and still could have done its job properly." This distinction is theoretically possible but inconsistent with the way in which the disgorgement proceeding was litigated. Southmark wanted the bankruptcy court to find that Coopers' overall lapses caused Southmark to fail to file a timely proof of claim, a scenario that would enhance its argument for full disgorgement of Coopers' multimillion dollar court-approved fees.[10] In contrast, to minimize the impact of its actions, Coopers contended that it did not influence Southmark's decision not to file a proof of claim against Drexel.

Regarding causation, the bankruptcy court stated that "Coopers did not cause Southmark to fail to file timely proof of claim in the Drexel bankruptcy case." As the court reasoned, the Examiner notified Southmark of the Drexel proof of claim bar date and that the Examiner would not develop the securities claims; the basis for the Drexel claim was being alluded to by the media; and Southmark had made an intentional decision to pursue other avenues

---

[10]For instance, Southmark's pleadings in the disgorgement proceeding specifically state that Southmark "surely would have" filed a Drexel proof of claim had Coopers "further investigated and disclosed" theories of liability against Drexel.

with its limited resources. Near the end of the disgorgement order, the court rephrased its causation finding, noting that "the *non-disclosure* did not cause Southmark to fail to timely file a proof of claim in the Drexel case." (emphasis added). The court was not limiting the generality of its earlier finding, however, for this additional finding bears on the narrow compass of a violation that the court finally found after rejecting Southmark's attack on Coopers' total fee.

The court's findings of no causation, as well as its recitation of the law applicable to disgorgement, lead us to reject Southmark's additional contention that a causation finding was not necessary. Southmark is wrong because the amount of disgorgement depended in large part on the harm done to Southmark by Coopers' ethical lapse. *See In re Kendavis Indus. Int'l., Inc*., 91 B.R. 742, 762 (Bankr. N.D. Tex. 1988). The bankruptcy court wrote that he "had to consider that [causation] issue in performing the fact-specific inquiry required by case law to determine whether a professional must disgorge fees." The bankruptcy court also wrote in ruling on issue preclusion that he would have had to reappraise the disgorgement amount if he had been convinced that Coopers' omissions caused Southmark to forfeit a significant recovery opportunity in the Drexel bankruptcy. As he observed, Southmark sought a multimillion dollar recovery from Coopers. A ruling on

21

causation was necessary to the court's decision on the amount of disgorgement.[11]

Southmark finally urges that causation was not actually litigated in the disgorgement proceeding. After a careful review of the record and the bankruptcy court's rulings, we cannot accept this contention. Southmark sought full return of Coopers' accounting fees in the disgorgement proceeding, while Coopers parried by arguing that it should not have to return fees for valuable services rendered in aspects of the bankruptcy other than the Drexel claims and by denying that its breaches caused Southmark's non-filing of a Drexel claim. The court balanced the facts and equities, finally arriving at a disgorgement penalty that quadrupled the amount of fees Coopers charged on Drexel matters but rejected both the complete restitution of fees sought by Southmark and restitution based on any causal connection between Coopers' actions and Southmark's failure to file a claim against Drexel.

The three criteria for issue preclusion accordingly have been satisfied on the causation of Southmark's damages with respect to the Drexel bankruptcy.

---

[11]Southmark disputes the bankruptcy court's discretion to award a sliding-scale disgorgement, and hence to consider causation of damages. The company is apparently persisting in its earlier contention in the disgorgement proceeding that a violation of § 328(c) requires restitution of all fees received by the professional firm. But having lost and not appealed the bankruptcy court's failure to order complete disgorgement, Southmark cannot now ignore the court's fact-specific ruling.

## 2. Claim Preclusion

Although issue preclusion prevents Southmark's attempt to relitigate a critical issue against Coopers, we must briefly distinguish that result from the lower courts' rather perfunctory reliance on claim preclusion. Claim preclusion,[12] or *res judicata*, bars the litigation of claims that either have been litigated or should have been raised in an earlier suit. *Super Van Inc. v. San Antonio*, 92 F.3d 366, 370 (5th Cir. 1996). The test for claim preclusion has four elements:

> (1) The parties are identical or in privity;
> (2) the judgment in the prior action was rendered by a court of competent jurisdiction;
> (3) the prior action was concluded to a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions.

*Swate v. Hartwell*, 99 F.3d 1282, 1286 (5th Cir. 1996).

To determine whether two suits involve the same claim under the fourth element, this court has adopted the transactional test of the Restatement (Second) of Judgments, § 24. *Southmark*

---

[12]Coopers did not raise res judicata as a defense once the case was removed to bankruptcy court. Generally speaking, pursuant to Fed. R. Civ. P. 8(c), res judicata is an affirmative defense and should not be raised *sua sponte*. *Carbonell v. Louisiana Dept. of Health & Human Resources*, 772 F.2d 185, 189 (5th Cir. 1985). Without considering whether any exceptions to this rule apply in this case, this court simply notes that Southmark failed to complain of this omission on appeal, and thus, waived any objections to the bankruptcy court's *sua sponte* consideration of res judicata.

*Properties v. Charles House Corp.*, 742 F.2d 862, 870-71 (5th Cir. 1984).  Thus, the critical issue is whether the two actions under consideration are based on "the *same nucleus of operative facts.*" *In re Baudoin*, 981 F.2d 736, 743 (5th Cir. 1993) (quoting *In re Howe*, 913 F.2d 1138, 1144 (5th Cir. 1990).  In the instant case, the bankruptcy court found that the disgorgement proceeding and this action involved the "same nucleus of operative facts;" indeed, this action was "litigation resulting from a single transaction with different forms of relief being requested."  The court also observed that Southmark could have raised its present claims when it originally sought disgorgement of Coopers' fees: to the extent any of Southmark's claims were non-core, the district court could have adopted the bankruptcy court's findings of law and fact or withdrawn the order of reference.

Southmark asserts that the bankruptcy court erred in finding claim preclusion because disciplinary measures pursuant to procedural rules do not have preclusive effect on subsequent substantive claims.  Southmark cites *Cohen v. Lupo*, 927 F.2d 363, 365 (8th Cir. 1991), which held that the tort of malicious prosecution and a Rule 11 disciplinary proceeding "differ in their nature, the elements of the claims, and the potential remedies."[13]

[13]*See also Lightning Lube, Inc. v. Whitco Corp.*, 4 F.3d 1153, 1196 (3d Cir. 1993) ("the denial of a Rule 11 motion does not foreclose the assertion of a subsequent malicious prosecution

24

By analogy, Southmark contends that a disgorgement proceeding pursuant to 11 U.S.C. § 328(c) should similarly not bar subsequent substantive claims, as it is essentially a remedial penalty provision. *See*, *e.g.*, *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994) (citing legislative history for the proposition that § 328(c) "authorizes a 'penalty' for failing to avoid a disqualifying conflict of interest").

Southmark has expressed an important insight, but we believe the roots of the claim preclusion problem lie deeper than the distinction between an ancillary penalty proceeding (*e.g.* Rule 11 or disgorgement) and a substantive cause of action. While this court has held that claim preclusion applies only to core proceedings in bankruptcy,[14] we have not determined that it applies to all core proceedings. Thus, we have held that claim preclusion does not apply where, because of bankruptcy's truncated procedures on motions to lift stay, lender liability claims could not have been brought and litigated in the earlier proceeding. D-1 Enterps., Inc. v. Commercial State Bank, 864 F.2d 36, 38-39 (5th

---

suit...."); *cf. Port Drum Co. v. Umphrey*, 852 F.2d 148, 150 (5th Cir. 1988) ("If Rule 11 did expand substantive rights, it would be invalid under the Enabling Act" because it regulates procedure rather than create a new substantive right or an independent cause of action).

[14]*Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 189 (5th Cir. 1990).

Cir. 1989).[15] Whether the non-trial-type procedures utilized in the bankruptcy court to decide the disgorgement proceeding, or the unavailability of a jury trial,[16] or both circumstances may have meant that Southmark's state-law claims against Coopers could not have been litigated, or litigated effectively, before the bankruptcy court in the earlier proceeding, is an interesting question. *Cf. In re Howe*, 913 F.2d at 1146. We will not speculate on complications arising from the additional possibility, mentioned by the bankruptcy court, that if Southmark had filed its malpractice action together with the motion to disgorge fees, the bankruptcy court could have heard both matters pursuant to a referral from the district court. Enough has been said to dispel the notion that claim preclusion is obviously applicable here.

**CONCLUSION**

Based on the foregoing discussion, we hold that the bankruptcy court had core jurisdiction over this case; that it did

---

[15]*See also In re Howe*, 913 F.2d at 1143-47 (holding that claims raised in later litigation were barred because they could have been fully litigated in Chapter 11 reorganization process).

[16]We have also held that a debtor does not waive the right to a jury trial by filing a voluntary bankruptcy case. *In re Jensen*, 946 F.2d 369 (5th Cir. 1991); *but cf. Billing,* 22 F.3d at 1242-54 (holding that debtors have no right to jury trial on malpractice claims against their attorneys); *Id*. at 1254-1260 (Sloviter, C.J., dissenting). The authority of a bankruptcy court to hold a jury trial, in cases like this, before the 1994 amendment to U.S.C. § 157(e), was in great doubt. See 1 Collier on Bankruptcy 15th Edition Revised ¶3.08 (1998).

not abuse its discretion by refusing to remand; and that Southmark was precluded from relitigating the finding that Coopers did not cause it to fail to file a timely claim in the Drexel bankruptcy.

**AFFIRMED.**