**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

HENRY GRAUSZ, M.D.,
*Plaintiff-Appellant,*

v.

BRADFORD F. ENGLANDER;
LINOWES AND BLOCHER, L.L.P.,
*Defendants-Appellees.*

No. 01-2317

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-01-2174-PJM)

Argued: September 23, 2002

Decided: March 6, 2003

Before MICHAEL and GREGORY, Circuit Judges, and
Rebecca Beach SMITH, United States District Judge
for the Eastern District of Virginia,
sitting by designation.

Affirmed by published opinion. Judge Michael wrote the opinion, in
which Judge Gregory and Judge Smith joined.

## COUNSEL

**ARGUED:** Joseph Daniel Gallagher, GILL & SIPPEL, Rockville,
Maryland, for Appellant. Andrew Jay Graham, KRAMON &
GRAHAM, P.A., Baltimore, Maryland, for Appellees. **ON BRIEF:**

Geoffrey H. Genth, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for Appellees.

---

**OPINION**

MICHAEL, Circuit Judge:

This is a professional malpractice action filed by a Chapter 11 debtor against the law firm that represented him in his bankruptcy case. We hold that the district court had bankruptcy jurisdiction over this action under 28 U.S.C. § 1334 because the malpractice claim arose in the bankruptcy case. In addition, we affirm the district court's award of summary judgment to the law firm because the malpractice claim is barred on res judicata grounds by an earlier order of the bankruptcy court.

I.

The facts and procedural history are not disputed. On December 29, 1997, Henry Grausz, M.D., filed a Chapter 11 bankruptcy petition in the District of Maryland. Grausz was represented by Bradford F. Englander and his law firm, Linowes & Blocher, LLP (collectively, the "Linowes firm"). One of Grausz's major creditors was John F. Sampson, who was acting in his capacity as liquidator of GFI Commercial Mortgage, L.P. In October 1997, shortly before Grausz filed for bankruptcy, Sampson's predecessors had obtained a judgment for $5.17 million plus interest against Grausz in California state court. Grausz appealed the California judgment, and based on the judgment, Sampson filed a proof of claim for approximately $6.5 million in Grausz's bankruptcy case. These events prompted communication between Grausz and Sampson. Grausz, with the assistance of Englander, negotiated and entered into a settlement agreement with Sampson that was approved by the bankruptcy court on June 8, 1998. Several provisions of the settlement agreement are pertinent. First, Grausz agreed to withdraw his appeal from the California judgment. In return, Sampson agreed to accept an allowed, unsecured, non-priority claim of $4 million in Grausz's bankruptcy case. Second, Grausz agreed to file amended schedules of assets and liabilities. He

warranted that the amended schedules would contain a complete and accurate listing of all of his assets as of the date of his bankruptcy petition. Third, Grausz agreed that if he should breach this warranty, Sampson would be free to object to the discharge of Grausz's debts. Fourth, Grausz agreed that any breach by him of the warranty would be deemed a post-petition breach, making him liable for a claim for damages by Sampson that would survive any resolution of the bankruptcy case.

Englander prepared the amended schedules in consultation with Grausz, and Grausz filed them on June 22, 1998. The amended Schedule B (listing personal property) identified Grausz's household goods and furnishings as "goods held in storage" and itemized in a "packing list" attached as an exhibit. According to Grausz, the packing list — which was prepared by others — was supposed to be a list of households items allocated to him when (in September 1996) he and his wife divided the personal property in their California home pursuant to their separation. In any event, Grausz says that the household items not taken by his wife were shipped to a storage unit in Maryland to await his retrieval. The amended Schedule B did not make any reference to community property, even though Grausz was still married when he filed his petition, and his matrimonial domicile was in California, a community property state. Grausz contends that Englander assured him that the packing list attached to amended Schedule B was adequate to identify his household property and that it would not be necessary to verify the accuracy of the list. Grausz also claims that Englander failed to advise him that it would be necessary to list his community property interests on the amended schedules.

The unsecured creditors' committee, chaired by Sampson, arranged for an inventory of Grausz's storage unit in October 1999. The inventory revealed that valuable items on the packing list were missing. In January 2000 the creditors' committee objected to Grausz's disclosures, in part because of inaccuracies in the listing of household goods and furnishings. On February 18, 2000, the Linowes firm filed its first interim fee application to collect for its work as Grausz's bankruptcy counsel through November 30, 1999. Grausz did not object to the application. On March 6, 2000, Sampson commenced an adversary proceeding against Grausz by filing a complaint to have Sampson's

claim declared nondischargeable and to deny Grausz's discharge. Sampson alleged that Grausz breached the warranty in the settlement agreement by filing an amended Schedule B (incorporating the packing list) that contained an incorrect and incomplete list of Grausz's personal property. Sampson claimed, among other things, that Grausz had failed to account for a significant number of valuable articles, including antiques and works of art. After the Sampson nondischargeability suit was filed, Grausz asked Englander what the Linowes firm would charge to defend him (Grausz) in the litigation. When Englander requested a $25,000 retainer, Grausz replied that he would not, or could not, pay it. Grausz then accused Englander of incompetence in negotiating the settlement agreement with Sampson. Grausz said that the settlement agreement had gotten him into the problem with Sampson, that entering the agreement was a mistake, and that he entered it only because of Englander's bad advice. Englander replied that "if [Grausz] had genuine concerns about the quality of [Englander's] work in connection with [the] Sampson [settlement], he should hire substitute counsel rather than continue with an attorney in whom he claimed to have lost confidence." On April 26, 2000, the bankruptcy court approved the Linowes' firm's first interim fee application, awarding fees of nearly $250,000. On May 18, 2000, Englander, on behalf of the Linowes firm, moved to withdraw as Grausz's counsel, and the bankruptcy court granted the motion on May 25, 2000. On July 28, 2000, the Linowes firm filed its second and final fee application. In the second application, the firm sought final approval of the interim fees awarded for the period through November 30, 1999, and about $15,000 for the services rendered between December 1, 1999, and May 25, 2000. Grausz did not object to the second fee application. The bankruptcy court entered an order on October 23, 2000 (the "final fee order"), finalizing the first interim fee award and allowing the additional fees of about $15,000.

Sampson's case against Grausz to determine dischargeability was tried before the bankruptcy court on March 6 and 7, 2001, and the court issued its decision on March 9. The court found, among other things, (1) that Grausz breached the warranty in the settlement agreement by his failure to list substantial community property interests on his amended Schedule B, (2) that the packing list attached to the amended schedule did not satisfy disclosure requirements, and (3) that Grausz, by resorting to vague and indefinite statements, failed to sat-

isfactorily explain the loss of certain of his assets, including several valuable paintings. Based on these findings, the bankruptcy court entered an order denying Grausz a discharge. Grausz asserts that the denial of discharge exposes him to liabilities in the neighborhood of $30 million.

On June 21, 2001, following the denial of his discharge, Grausz filed this legal malpractice action against the Linowes firm in the Circuit Court for Prince George's County, Maryland. He alleges that the Linowes firm (1) negligently failed to advise him to list his community property interests on his amended Schedule B and (2) negligently failed to advise him to verify the accuracy of the packing list that was attached to the schedule. The Linowes firm's negligence, Grausz says, caused him to breach the full disclosure warranty in the settlement agreement. This breach, in turn, allowed Sampson to obtain the order denying Grausz's discharge. Grausz seeks damages for his liability to creditors resulting from the nondischargeability order. The Linowes firm promptly removed the action to the U.S. District Court for the District of Maryland, asserting bankruptcy jurisdiction under 28 U.S.C. § 1334. The Linowes firm filed a motion to dismiss or, in the alternative, for summary judgment on the ground that under res judicata principles the bankruptcy court's final fee order (approving fees for the Linowes firm) barred the malpractice claim. Grausz, in turn, moved to remand the case to state court, arguing that the district court lacked federal subject matter jurisdiction. After briefing and oral argument, the district court, in a ruling from the bench, held that principles of res judicata barred Grausz's malpractice claim. The court then entered a formal order granting the Linowes firm's motion for summary judgment. The court declined to rule on Grausz's motion to remand, saying that it was moot. Grausz appeals.

## II.

Grausz first argues that the district court lacked subject matter jurisdiction to hear this case, which he commenced in Maryland state court by filing a complaint for legal malpractice against the Linowes firm. The Linowes firm removed the case, asserting bankruptcy jurisdiction under 28 U.S.C. § 1334(b). Section 1334(b) gives district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

We agree with the Linowes firm that Grausz's malpractice claim, which originated in the firm's work for Grausz in his bankruptcy case, is a claim "arising in" the bankruptcy case. As a result, there is federal jurisdiction.

In *A.H. Robins Co. v. Dalkon Shield Claimants Trust*, 86 F.3d 364 (4th Cir. 1996), we examined the scope of "arising in" jurisdiction under § 1334(b). We held that proceedings or claims arising in Title 11 are those that "are not based on any right expressly created by Title 11, but nevertheless, would have no existence outside of the bankruptcy." *A.H. Robins*, 86 F.3d at 372 (quotation omitted). In other words, a "controversy arises in Title 11" when "it would have no practical existence *but for* the bankruptcy." *Id.* (emphasis added). *A.H. Robins* did not discuss bankruptcy jurisdiction over a professional malpractice claim. Nevertheless, the case's broad interpretation of "arising in" jurisdiction surely means that jurisdiction exists over a malpractice claim against a lawyer for providing negligent advice to a debtor in a bankruptcy case. *See, e.g.*, *In re Simmons*, 205 B.R. 834, 841 (Bankr. W.D. Tex. 1997) (citing *A.H. Robins* and stating that "claims of malpractice which originated out of pre- and post-petition advi[c]e of counsel concerning the *bankruptcy itself* are matters that fall within 'arising in' jurisdiction").

Grausz argues that there is no federal bankruptcy jurisdiction because his malpractice claim is personal to him and is not the property of his bankruptcy estate. But the claim arises in the bankruptcy case, regardless of whether it belongs to him or the estate. Grausz's claim is that the Linowes firm committed malpractice in his bankruptcy case by, among other things, (1) negligently failing to advise him to list his community property interests on the amended Schedule B and (2) negligently failing to advise him to verify the accuracy of the packing list attached to the amended schedule. This malpractice claim "would have no practical existence but for the bankruptcy" case. *See A.H. Robins*, 86 F.3d at 372. The claim thus arises in Title 11, and the district court had subject matter jurisdiction under 28 U.S.C. § 1334(b).

III.

Grausz argues that even if the district court had subject matter jurisdiction over his malpractice action, the court erred in granting

summary judgment to the Linowes firm on the ground that the bank-ruptcy court's final fee order barred the malpractice claim under prin-ciples of res judicata. After reviewing the district court's decision de novo, *see Keith v. Aldridge*, 900 F.2d 736, 739 (4th Cir. 1990), we hold that Grausz's malpractice claim is barred.

We look to res judicata principles developed in our own case law to determine whether an earlier federal judgment, including the judg-ment of a bankruptcy court, bars a claim asserted in a later action. *Keith*, 900 F.2d at 739; *see also Harnett v. Billman*, 800 F.2d 1308, 1312-13 (4th Cir. 1986). The later claim is precluded when:

> 1.) the prior judgment was final and on the merits, and ren-dered by a court of competent jurisdiction in accordance with the requirements of due process; 2) the parties are iden-tical, or in privity, in the two actions; and, 3) the claim[ ] in the second matter [is] based upon the same cause of action involved in the earlier proceeding.

*In re Varat Enters., Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996).

We agree with the district court's determination on the first ele-ment, which is not contested, that the bankruptcy court's final fee order approving the Linowes firm's second and final fee application is a final judgment on the merits. This order resolved all issues relat-ing to the Linowes firm's fee applications in the Grausz bankruptcy, including the matter of finalizing the interim fee award.

As to the second element, Grausz argues that there is not a suffi-cient identity of parties in the two actions — the fee application pro-ceeding and the legal malpractice case — to support a res judicata defense. Specifically, he claims that he was not a "party in interest" in the fee application proceeding. *See* 11 U.S.C. § 502(a) (allowing a "party in interest" to challenge claims made against the estate). By the time the Linowes firm filed its fee applications, a trustee had been appointed to administer Grausz's bankruptcy estate. According to Grausz, the trustee, as the representative of the estate, was the party in interest opposite the Linowes firm in the fee applications. Grausz says that he had no interest in the outcome of the fee proceeding. We disagree. In the bankruptcy context a party in interest is one who has

a pecuniary interest in the distribution of assets to creditors. *Willemain v. Kivitz*, 764 F.2d 1019, 1022 (4th Cir. 1985). Here, Grausz's disclosure statement and plan of liquidation projected that there would be insufficient funds in the estate to pay off all nondischargeable priority claims, including claims for taxes and for back alimony and support. If legal fees were reduced or disallowed, there would be more money available in the estate to pay the nondischargeable priority claims, and Grausz's personal liability would be reduced. Grausz therefore had a pecuniary interest in the outcome of the fee applications, making him a party in interest to that proceeding. *Cf. McGuirl v. White*, 86 F.3d 1232, 1234-35 (D.C. Cir. 1996). As a result, there is an identity of parties in the fee proceeding and the malpractice case.

We turn to the third element in the res judicata analysis, whether "the claim[] in the second matter," the malpractice action, is "based upon the same cause of action involved in the earlier [fee] proceeding." *Varat*, 81 F.3d at 1315. Our court recognizes that "[n]o simple test exists to determine whether [claims are based on the same cause of action] for claim preclusion purposes." *Pittston Co. v. United States*, 199 F.3d 694, 704 (4th Cir. 1999). Generally, we say that "claims are part of the same cause of action when they arise out of the same transaction or series of transactions, or the same core of operative facts." *Varat*, 81 F.3d at 1316 (citations omitted). The "core of operative facts" in the two actions here — the fee application proceeding and the malpractice action — are the same. Both actions relate to the nature and quality of legal services the Linowes firm provided to Grausz in connection with the bankruptcy proceeding. *See In re Iannochino*, 242 F.3d 36, 47 (1st Cir. 2001); *In re Intelogic Trace, Inc.*, 200 F.3d 382, 387 (5th Cir. 2000) (noting that the "central transaction" involved in the fee application and malpractice claim was the provision of professional services). The fee application proceeding necessarily included an inquiry by the bankruptcy court into the quality of professional services rendered by the Linowes firm. The court was required to "consider the nature, the extent, and the value of such services" before awarding fees. 11 U.S.C. § 330(a)(3). *See also Iannochino*, 242 F.3d at 47; *Intelogic*, 200 F.3d at 387. By granting the Linowes firm's second and final fee application, the bankruptcy court impliedly found that the firm's services were acceptable throughout its representation of Grausz. The order approving the second and final fee application finalized the fees awarded on the first interim fee

application. The first application included the Linowes firm's billings for advice and services to Grausz in preparing the amended schedules. Grausz's malpractice claim, which alleges that the firm was negligent in advising him about disclosure requirements, addresses this very same work. We conclude, therefore, that the fee applications and Grausz's legal malpractice claim arise out of the same "core of operative facts." The malpractice claim is rooted in the same cause of action as the earlier claim for fees.

Although the three formal elements for claim preclusion are present, our inquiry is not complete, at least not in this case. Because it might not appear at first blush that a malpractice claim should be asserted in a bankruptcy fee proceeding, two practical considerations should be taken into account. *See Pittston*, 199 F.3d at 704; *see also* Restatement (Second) of Judgments § 24(2). These are (1) whether Grausz knew or should have known before the fee proceeding ended of the real likelihood of a malpractice claim, *see Intelogic*, 200 F.3d at 388; and (2) whether the fee proceeding in bankruptcy court provided Grausz an effective forum to litigate his malpractice claim, *see id.* at 389.

We look at the date the final fee order was entered, October 23, 2000, and ask whether by that time Grausz knew or should have known there was a real likelihood that he had a malpractice claim against the Linowes firm. By that time (1) Sampson had filed the non-dischargeability suit against Grausz, alleging that Grausz's amended Schedule B (incorporating the packing list) was an inadequate disclosure of his personal property; (2) Grausz knew that the schedule challenged by Sampson had been prepared by the Linowes firm; (3) Grausz had accused Englander (of the Linowes firm) of incompetence, saying that the settlement agreement negotiated by Englander had gotten him (Grausz) into his problem with Sampson; and (4) the Linowes firm had withdrawn as Grausz's bankruptcy counsel due to his dissatisfaction with the firm's services.

Despite the above, Grausz argues that he could not have understood that he would have a malpractice claim against the Linowes firm before the final fee order was entered. Before that order was entered, Sampson was only alleging that Grausz breached the settlement agreement by filing an inadequate list (the packing list) of per-

sonal property. Sampson's suit was not tried until after the final fee order; and, according to Grausz, the bankruptcy court relied on a different breach of the settlement agreement — failure to list community property interests — to deny Grausz a discharge. Grausz contends that he could not have anticipated that the court would find that his nondisclosure of community property was a breach, and thus he could not have foreseen the need to object (at the time of the fee proceeding) on the ground that the Linowes firm negligently failed to advise him on community property issues. This argument ignores that the bankruptcy court relied in part on the inadequacy of the packing list to deny the discharge. Moreover, it ignores that Grausz's malpractice complaint alleges that the Linowes firm was negligent in allowing him to use the packing list in amended Schedule B without verifying it, and it ignores that Grausz knew — by the time the final fee order was entered — about the problems with the packing list and his dissatisfaction with the firm's work. Again, before the final fee order was entered, Grausz knew that the Linowes firm had advised him about the use of the packing list in amended Schedule B, he knew that Sampson relied on the inadequacy of the packing list to allege breach of the settlement agreement in the nondischargeability suit, and he believed that Englander had performed incompetently in negotiating the settlement agreement with Sampson. In short, by the time the bankruptcy court entered the final fee order for the Linowes firm, Grausz knew or should have known there was a real likelihood that he had a malpractice claim against the firm.

We turn to the second practical consideration, whether the fee proceeding in bankruptcy court provided Grausz with an effective opportunity to litigate his malpractice claim. Grausz could have objected to the Linowes firm's fee application and included with his objection a claim for affirmative relief on account of the firm's alleged malpractice. *See Intelogic*, 200 F.3d at 389-90. In that event, the matter would have become an adversary proceeding. *See* Fed. Bankr. R. 3007. Procedural mechanisms were therefore available for Grausz to raise his malpractice claim in connection with the fee proceeding.

Grausz claims, however, that forcing him to assert his malpractice claim in bankruptcy court deprives him of his right to a jury trial. If there is a right to a jury trial, there are procedures to accommodate that right. An adversary proceeding brought by a debtor to assert a

malpractice claim against his bankruptcy lawyer is a case that falls within a bankruptcy court's core jurisdiction under 28 U.S.C. § 157. *See In re Southmark*, 163 F.3d 925, 930-32 (5th Cir. 1999). Such a case may be tried before a bankruptcy judge and a jury with the authorization of the district court and the consent of the parties. *See* 28 U.S.C. § 157(e). In any event, an adversary proceeding may be transferred to the district court if a jury trial is required. *See In re Stansbury Poplar Place, Inc.*, 13 F.3d 122, 128-29 (4th Cir. 1993); *compare Southmark*, 163 F.3d at 935 n.16 ("[D]ebtor does not waive the right to a jury trial by filing a voluntary bankruptcy case."), *with Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1253 (3rd Cir. 1994) (treating debtors' malpractice claim, asserted as a defense to lawyers' fee petition, as an equitable dispute that did not give rise to the right to a jury trial).

Grausz also argues that he could not have raised his malpractice claim in the fee proceeding for a more fundamental reason. He says his claim was not mature because he had no damages before the final fee order was entered. He said that he suffered no damages until later, when Sampson's nondischargeability trial concluded, and the court denied Grausz a discharge. Grausz, however, did have damages to allege before the final fee order was entered. Up until the time the final fee order was entered, the matter of the $250,000 payment of interim fees to the Linowes firm was not settled. If those fees were paid for substandard work, Grausz was damaged before the final fee order was entered. Recovery of all or part of the interim fees would have made more money available to pay nondischargeable debt, thus reducing Grausz's personal liability. Moreover, if Grausz was concerned about not being able to finalize his malpractice damages at the time of the fee proceeding, he could have requested a stay of that proceeding pending the court's resolution of Sampson's nondischargeability suit. *See Intelogic*, 200 F.3d at 390. (It is worth noting that in his malpractice complaint filed *after* the nondischargeability order was entered, Grausz alleges that the amount of his damages are "yet to be finally determined.") It is important to hold Grausz's feet to the fire, for if he could pursue his malpractice claim now and obtain a judgment, that judgment could undermine the validity of the final fee order, which finalizes the award of some $265,000 in fees to the Linowes firm for work held to meet acceptable professional standards. Because "a bankruptcy court can order professionals to dis-

gorge fees that it had previously awarded them," Grausz's successful prosecution of a malpractice action at this stage could impair rights accorded the Linowes firm in the final fee order. *Iannochino*, 242 F.3d at 43. Such a result would undermine a fundamental purpose of the doctrine of res judicata: "preventing inconsistent decisions, [and] encourag[ing] reliance on adjudication." *Bay State HMO Mgmt., Inc. v. Tingley Sys., Inc.*, 181 F.3d 174, 181 (1st Cir. 1999) (quotation omitted).

Because all of the elements of res judicata are present, and no practical considerations prevent the fair application of the doctrine, we hold that Grausz's legal malpractice claim is barred by the final fee order in the bankruptcy case.

## IV.

The district court had subject matter jurisdiction, and its summary judgment order barring Grausz's malpractice action on grounds of res judicata is affirmed.

*AFFIRMED*