**In re INTELOGIC TRACE, INC., Debtor.**

**Randolph N. OSHEROW, Chapter 7 Trustee for the Estate of Intelogic Trace, Inc., Appellant,**

**v.**

**BUCCINO & ASSOCIATES, INC., and Ernst & Young LLP, Appellees.**

**Civ. No. SA–98–CA–596–EP.**
**Bankruptcy No. 95–50753C.**

United States District Court,
W.D. Texas,
San Antonio Division.

Oct. 13, 1998.

Pat Maloney, Jr., Law Offices of Pat Maloney, San Antonio, TX, for Randolph N. Osherow, Trustee.

Leslie J. Strieber, III, Davis, Adami and Cedillo, San Antonio, TX, for Buccino & Associates, Inc.

Patrick F. McManemin, McManemin & Smith, P.C., Dallas, TX, for Ernst & Young, LLP.

---

## ORDER

PRADO, District Judge.

On this date the Court examined the appeal of Appellant Randolph N. Osherow to the Bankruptcy Court's May 22, 1998, order granting summary judgment in favor of the defendants. After careful consideration of all the papers and pleadings on file, this Court is of the opinion that the order of the Bankruptcy Court should be affirmed.

### Jurisdiction and Venue

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 158(a). Venue is appropriate in this Court because this is an appeal from the Bankruptcy Court for the Western District of Texas.

### Scope of Review

■ The Court reviews the Bankruptcy Court's findings of fact for clear error. Conclusions of law, conversely, are reviewed de novo. *New Orleans Public Service, Inc. v. First Federal Savings and Loan Ass'n of Warner Robins*, 924 F.2d 74, 76 (5th Cir. 1991).

### Background and Procedural History

Intelogic Trace, Inc. ("Intelogic"), was a software and technical services provider in the computer industry. It fell into cash flow difficulties and sought Chapter 11 protection in August 1994. In September 1994 the bankruptcy court approved the employment of Ernst & Young, L.L.P. ("Ernst & Young"), to assist Intelogic with certain accounting matters in the bankruptcy. It also approved the employment of Buccino & Associates, Inc. ("Buccino"), as Management Consultant for Intelogic. Intelogic pursued a fast-track reorganization and emerged from Chapter 11 via a confirmed plan in December of that year. In January 1995, Ernst & Young and Buccino filed a fee application with the bankruptcy court for services provided in connection with the bankruptcy. On January 24, 1995, the bankruptcy court entered an order approving the payment of

Buccino's fees, and on January 25, 1995, the court entered an order approving Ernst & Young's fee application. No appeal was taken from the orders, and they became final.

Intelogic was unable to reverse its cash flow crisis, and on March 16, 1995, it filed a second Chapter 11 bankruptcy petition. Thereafter, the case was converted to a Chapter 7 liquidation, and the trustee was appointed. On November 7, 1996, the trustee sued Ernst & Young and Buccino, alleging negligence and malpractice.[1] The services at issue were those services covered by the fee application, subsequent hearings, and the court's approval of the fee requests. Buccino and Ernst & Young moved for summary judgment on the ground that these claims were barred by res judicata because they should and could have been raised during the fee hearing. The bankruptcy judge granted the defendants' motions, and the trustee appealed.

### Analysis

■ The trustee argues that the bankruptcy court erred in holding that its claims are barred by res judicata and that there is not an issue of triable fact remaining with regard to whether res judicata bars the trustee's claims.

The trustee begins by arguing that its claims are not barred by res judicata because: (1) its claims against Buccino and Ernst & Young were not compulsory counterclaims in the hearing upon application for fees in January 1995; (2) the application of the same cause of action rules for res judicata depends upon the scope of the compulsory counterclaim rule; and (3) the failure to interpose a noncompulsory counterclaim does not, as a matter of res judicata, bar its subsequent assertion as an independent claim for relief.

■ The trustee is basically arguing that if a counterclaim is not compulsory, it need not be asserted in the first proceeding, and because the compulsory counterclaim rules

---

1. The trustee's specific claims were: (a) violation of the duty to exercise ordinary care and diligence; (b) failure to perform all necessary and reasonable management consultant services on behalf of the debtor, Intelogic Trace, in its previ- ous Chapter 11 reorganization attempt;(c) negligence; (d) gross negligence; (e) professional negligence; (f) breach of warranty; (g) breach of contract; and (h) deceptive trade practices.

do not apply to contested matters, contested matters should not have a res judicata effect.[2] However, the trustee's emphasis on compulsory counterclaims is misplaced. The focal point is not on whether a counterclaim is compulsory; nor is it on whether a fee application is a contested matter, as opposed to an adversary proceeding. Rather, the focal point is on whether the claims in question could or should have been effectively litigated in the context of that contested matter, as the bankruptcy judge correctly noted. In this case, they clearly could and should have been.

The trustee argues that the claims in question could not have been effectively litigated in conjunction with the fee application proceeding. He states that these claims concern negligence and malpractice, which, under Federal Rule of Bankruptcy 7001, must be heard in an adversary proceeding. Although it is true that these claims must be heard in an adversary proceeding, the trustee misses the bankruptcy judge's point. With regard to whether the fee application hearing afforded an adequate opportunity to litigate any objections the debtor may have had based on the alleged malpractice of the defendants-appellees, had such objections been voiced, the bankruptcy court would have continued the fee application hearing and would have called for the commencement of an adversary proceeding to resolve any such allegations pursuant to Federal Rule of Bankruptcy 3007. That rule permits a court to apply the adversary rules to any contested claims proceeding, especially those proceedings in which a counterclaim is urged by the estate. See Fed.R.Bankr.P. 3007. Procedurally, therefore, the fee application hearing afforded the parties sufficient opportunity to litigate the sorts of claims now raised in this complaint.

Furthermore, allowing negligence and malpractice claims now to be brought against Buccino and Ernst & Young would be completely inconsistent with the bankruptcy judge's prior award of fees, as the bankruptcy judge correctly noted. See Southmark Properties v. Charles House Corp., 742 F.2d 862, 869 (5th Cir.1984); Hendrick v. Avent, 891 F.2d 583, 587 (5th Cir.), cert. denied, 498 U.S. 819, 111 S.Ct. 64, 112 L.Ed.2d 39 (1990). The central issue in a fee application is the reasonableness of the fees sought. In re Temple Retirement Community, Inc., 97 B.R. 333, 336 (Bankr.W.D.Tex.1989). The allowance of professional compensation by a bankruptcy court effects a finding as to the reasonableness of that compensation and the value of the services rendered to the estate. In re W.J. Services, Inc., 139 B.R. 824, 828 (Bankr.S.D.Tex.1992). Any question as to the quality of the professional services rendered goes directly to the value of those services to the estate and in turn to the reasonableness of that compensation. A claim of negligence by professionals in the performance of those services falls squarely within the range of factors that would be addressed in deciding whether to award compensation.

The trustee's final argument is that the bankruptcy court erred in holding that the Debtor's Board was sufficiently aware of any potential flaws in the appellees' work prior to the hearing on the fee application to raise the claims now being raised by the trustee, triggering res judicata. The trustee puts forward evidence that, he contends, demonstrates that Intelogic had not concluded by the time of the hearing on the appellees' fee application that it had any cause of action against the appellees (or, even if Intelogic had made this conclusion by the time of the fee application, it had only made the conclusion six days before the fee application).

The trustee's argument misses the point. Regardless of whether Intelogic had reached a final conclusion about the Appellees' performance by the time of the fee application proceeding, it knew enough to be on notice of at least a possible cause of action against them. Even if Intelogic believed that some further investigation was necessary, nothing in the record suggests that, with proper diligence, Intelogic could not have been ready to assert its claims at or before the time of the fee application hearing. In Matter of Howe, 913 F.2d 1138, 1147 (5th Cir.1990), the Fifth

---

**2.** The Appellant has made it clear that he acknowledges that the adversary versus contested matter analysis is not a litmus test or a bright-line rule.

Circuit stated that even if the debtors did not discover their claims at the time of the prior proceeding, there was no indication that they could not have done so. Like the debtors in *Howe,* Intelogic was aware of the basic facts suggesting, at a minimum, the possibility of a claim against Buccino and Ernst & Young. And, as in *Howe,* there is no suggestion here that any additional facts forming the basis of the claims could not have been discovered with proper diligence. To the contrary, the evidence shows that prior to the fee hearing Intelogic had every opportunity to consider the quality, nature, and value of the services the appellees rendered. It is very instructive to examine the deposition testimony and memorandum from Mr. Collins, a member of the Debtor's Reconstituted Board. The memorandum Mr. Collins addressed to the Board is most revealing. This memorandum suggests that the Board was generally aware of the problems with the Defendants' work and the Debtor's financial crisis but did not move to make any comprehensive conclusions and declined to raise the issue before the court because the Board did not want to raise questions about the company's financial health upon emerging so recently from Chapter 11. Collins' memo reads, in part:

> Management relied upon Buccino and their bankruptcy/crisis expertise in creating [the reorganization budget]. We now know the budget numbers were flawed in important respects. This led to a serious understatement of working capital requirements ... and the unforeseen need for the collateral liquidation proceeds of $1.4 million to fund operations. These are serious ramifications. In addition, I believe the company has already paid Buccino around $700,000. There may be negative reaction on the part of the judge to the assertion that Buccino's shortcomings caused damage to the company. In this regard steps have been taken by management to preserve liquidity despite the problems brought on by Buccino's numbers; consequently there is a good argument that the problem has not had the effect of changing the company's "fitness" for coming out of bankruptcy

... The performance of E + Y. I observe that the sudden deterioration of the company's financial position raises questions as to the veracity of E + Y's audited numbers at the very time the company is being asked to pay them $218,000 in fees. I understand the fees may not be related to the audit, but in my mind this arrangement does not seem right and as in the case of Buccino I wonder if Phil's suggested adjustments [to the fee application] go far enough.

Collins Memo.[3]

### Conclusion

This Court concludes that the Bankruptcy Court's decision to deny relief to the Appellant was correct and based on sufficient evidence. It must be affirmed.

Accordingly, it is hereby ORDERED that the bankruptcy judge's order granting summary judgment in favor of the defendants is AFFIRMED and this case is DISMISSED.

---

**3.** It is also troubling that the Debtor apparently soft-pedaled its fee objections for fear the bankruptcy court might react negatively to allegations of misfeasance on the part of the Defendants. As the bankruptcy judge stated, "we find particular-

ly irksome the implication that the Board may have thought that it could 'pull the wool over our eyes,' as it were, in order to proceed with the reorganization, knowing that there was trouble ahead."