IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

No. 98-51085

———————————

IN THE MATTER OF: INTELOGIC TRACE, INC., DEBTOR

RANDOLPH N. OSHEROW, TRUSTEE,

Appellant,

versus

ERNST & YOUNG, LLP,

Appellee.

———————————

Appeal from the United States District Court for the
Western District of Texas

———————————

January 25, 2000

Before GARWOOD, SMITH, and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-Appellant Randolph N. Osherow ("Trustee"), the bankruptcy trustee of Chapter 7 debtor Intelogic Trace, Inc. ("IT"), brought this action in state court against Defendant-Appellee Ernst & Young, LLP ("Ernst & Young"), alleging, *inter alia*, negligence and professional malpractice arising from services Ernst & Young performed during IT's previous Chapter 11 bankruptcy proceeding. The case was removed to the bankruptcy court under 28 U.S.C. § 1452. The Trustee now appeals on behalf of IT the bankruptcy court's decision, subsequently affirmed by the district court, granting summary judgment in favor of Ernst & Young

on the basis that the Trustee's claims were barred by *res judicata*. We affirm.[1]

## FACTS AND PROCEEDINGS BELOW

In 1994, IT, a software and technical services provider in the computer industry, began experiencing cash flow difficulties and consequently initiated bankruptcy proceedings under Chapter 11 on August 5, 1994. On September 2, 1994, the bankruptcy court approved the employment of Ernst & Young to assist IT in accounting related matters during the bankruptcy. Ernst & Young's services fell into two main areas: first, the performance of the annual audit of IT's July 1994 financial statements, including the completion of IT's Form 10K to be filed with the Securities and Exchange Commission; and second, consultation and negotiation with the Internal Revenue Service in connection with an ongoing examination of IT. IT pursued a fast-track reorganization and emerged from Chapter 11 through a confirmed plan on December 8, 1994.

Pursuant to the confirmed plan, Kevin Collins ("Collins") became chairman of IT's Board of Directors ("the Board"). Collins testified that, despite all the Board's efforts and the services provided to IT, by December 23, 1994 the Board "had serious concerns about the company's numbers and the state of the company's liquidity."

On January 8, 1995, Ernst & Young filed in the bankruptcy court an

---

[1] The Trustee filed similar claims against another professional services provider, Buccino & Associates. On identical grounds, the lower courts granted Buccino & Associates's motion for summary judgment; pursuant to a settlement agreement entered into pending this appeal, the Trustee has dismissed with prejudice all claims against Buccino & Associates.

2

application for $217,237 in fees and $1,743 in expenses incurred in connection with IT's Chapter 11 reorganization.  Other service providers filed similar applications, and a hearing was set for January 23, 1995.  Upon receipt of notice of the fee application, the Board, acutely aware of IT's cash flow difficulties, began to have heightened concerns about flaws in IT's cash projections and whether there might have been a problem with the professional work in preparing these projections.  In fact, Collins in his deposition stated that "by mid-January we considered the cash situation to be critical."

Despite these concerns, the Board, acting on the advice of its General Counsel Philip Freeman ("Freeman"),[2] affirmatively decided not to raise these concerns at the fee hearing before the bankruptcy court.  Collins testified that the Board and Freeman did not want the bankruptcy court to become aware of problems with the reorganization plan that had been confirmed only one month ago.  Although the Board had not come to any firm conclusions regarding whether malpractice occurred at this time, Collins testified that the Board knew the numbers were flawed, "had some questions about whether the company got its money's worth for some of the professional fees," and held "very, very possible concerns . . . about whether there might have been a problem with the professional work."  Instead of contesting the fees at the hearing on the basis of their quality, the Board decided, as Collins stated in his deposition,  to use its concerns and suspicions as "a negotiating chip

_____

[2] Collins testified that "Phil Freeman had expressed to the board his concern that [raising] extensive objections to fees . . . on the basis of some sort of nonperformance or anything–some sort of a problem that existed, would create a circumstance with the judge . . . that would be very unhelpful for the company."

that we could have to get the fees reduced."

On January 17, 1995, Collins sent a memo to Stan Springel, a turnaround specialist for IT, expressing these concerns and the decision not to raise issues regarding the competency of the services provided by Ernst & Young and others.  Collins's memo states in part:

> "I would appreciate it if you would consider this matter and discuss as appropriate with Phil Freeman so Phil or you can to talk to Buccino and/or E+Y this week.
> . . .
> We now know the budget numbers were flawed in important respects.  This led to a serious understatement of working capital requirements, the Board's recommendation that you be engaged and the unforeseen need for the collateral liquidation proceeds of $1.4 million to fund operations.  These are serious ramifications.
> There may be negative reaction on the part of the judge to the assertion that Buccino's shortcomings caused damage to the company.  In this regard steps have been taken by management to preserve liquidity despite the problems brought on by Buccino's numbers; consequently there is a good argument that the problem has not had the effect of changing the company's 'fitness' for coming out of bankruptcy.
> *Ernst & Young; $218,980* – The Audit Committee of the Board has not yet had an opportunity to examine the performance of E+Y.  I observe that the sudden deterioration of the company's financial position raises questions as to the veracity of E+Y's audited numbers at the very time the company is being asked to pay them $218,000 in fees.  I understand that the fees may not be related to the audit, but in my mind this arrangement does not seem right and as in the case of Buccino I wonder if Phil's suggested adjustments go far enough."

Freeman implemented the Board's strategy of using concerns over the quality of the professional services to negotiate lower fees and reported in a January 18, 1995 memo to the Board that he was successful in reducing Ernst & Young's fees: "I am pleased to advise that we had negotiated a fee reduction with Ernst & Young of $37,000 from their fee application for $218,980.  In return we will unqualifiedly support their fee application.  I am awaiting responses from other fee applicants."

On January 23, 1995, the bankruptcy court held a hearing for all the service providers' fee applications. At the hearing, Freeman was present on behalf of IT and did not oppose Ernst & Young's application, subject to the $37,000 reduction. Following an examination of Tom Richter, a partner of Ernst & Young, the bankruptcy court found the fees to "have passed muster," without objection by Freeman. Two days later, the bankruptcy court approved an allowance of $180,237 for fees and $1,243 for expenses for Ernst & Young.

Despite the efforts of IT's management and its professional services providers, but consistent with the Board's above- mentioned concerns, IT's financial problems continued under the reorganization plan. On March 16, 1995, IT filed a second voluntary Chapter 11 petition. This second Chapter 11 proceeding was later converted into the instant Chapter 7 liquidation with Randolph N. Osherow appointed as trustee.

After Ernst & Young had filed in the instant bankruptcy a claim for the unpaid fee awarded it in the prior bankruptcy, the Trustee, on November 7, 1996, filed this suit against Ernst & Young in a Texas state court, alleging the following causes of action, all in respect to Ernst & Young's functioning as IT's accountant in the initial Chapter 11: (1) violation of the duty to exercise ordinary care and diligence; (2) negligence; (3) gross negligence; (4) professional negligence; (5) breach of warranty; (6) breach of contract; and (7) deceptive trade practices. The Trustee alleged that "EY [Ernst & Young] owed a duty to IT to perform all necessary and reasonable accounting services on behalf

5

of IT as set forth in its application [referring to the application in the initial Chapter 11 for the bankruptcy court to approve IT's retaining of Ernst & Young "as accountant for the debtor in possession"] and EY failed in such duties and failed to provide the services as represented." The Trustee's particular focus was that Ernst & Young failed to adequately contact IT's customers respecting prepayment of contracts. This led to flaws in the construction of financial projections and an operating plan for IT, eventually resulting in IT's cash shortfall and collapse.

Pursuant to 28 U.S.C. § 1452, Ernst & Young removed this case to the bankruptcy court supervising IT's Chapter 7 liquidation. Ernst & Young, subsequently, moved for summary judgment on the basis that the Trustee's claims were barred by *res judicata*, *collateral estoppel*, or waiver. Concluding that the Trustee's claims were barred by *res judicata*, the bankruptcy court granted Ernst & Young's motion. The district court affirmed the bankruptcy court's order. *In Re Intelogic Trace Inc.*, 226 B.R. 382 (W.D. Tex. 1998). We affirm.

## DISCUSSION

The Trustee argues that the district court erred in affirming the bankruptcy court's summary judgment order finding *res judicata* barred this action. This Court reviews the grant of summary judgment *de novo*, applying the same standards as the district court. *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Summary judgment is proper only where, viewing the evidence in the light most favorable to the nonmoving party, the court determines that there is no genuine issue of material fact and judgment is proper as a matter

6

of law.  *See id.;* FED. R. CIV. P. 56(c).

This Circuit's test for determining whether a claim is barred by the doctrine of *res judicata,* or claim preclusion, is as follows:

> "'For a prior judgment to bar an action on the basis of *res judicata*, the parties must be identical in both suits, the prior judgment must have been rendered by a court of competent jurisdiction, there must have a final judgment on the merits and the same cause of action must be involved in both cases.'" *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 559 (5th Cir. 1983) (*en banc*) (quoting *Kemp v. Birmingham News Co.*, 608 F.2d 1049, 1052 (5th Cir. 1979)).

The parties agree that the first three elements are satisfied; they disagree on the final element which we now address.

To determine whether the Chapter 11 fee application hearing and this suit involved the same cause of action, we apply the transactional test of the Restatement (Second) of Judgments.[3]  *See Nilsen*, 701 F.2d at

---

[3]  Section 24 of the Restatement provides in relevant part as follows:

> "(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar . . ., the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." RESTATEMENT (SECOND) OF JUDGMENTS § 24 (1982).

Comment c to section 24 further explains as follows:

> "Transaction may be single despite different harms, substantive theories, measures or kinds of relief . . .. That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims.  This remains true although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief."  *Id.* § 24 cmt. c.

The Trustee notes that in deciding whether the same causes of action are asserted in a subsequent suit, this Circuit has examined whether the

7

560. The critical issue under this determination is whether the two actions under consideration are based on "the same nucleus of operative facts." *In re Howe*, 913 F.2d 1138, 1144 (5th Cir. 1990).

The Trustee argues that this action does not meet the transactional test because the fee application hearing addressed whether Ernst & Young "provide[d] the time, incur[red] the expenses, or charge[d] the appropriate hourly rate set forth in its fee application," while this malpractice claim is largely based upon what Ernst & Young did not do, rather than what it did do.  Specifically, the Trustee refers to Ernst & Young's alleged failure to contact customers respecting prepayment of their contracts with IT, resulting in flaws in constructing IT's financial projections and operating plan.  The Trustee claims the flawed financial projections and operating plan resulted in irreversible cash flow problems for IT, leading to its second bankruptcy petition.  We do not agree with the Trustee's conclusion that the transactional test is not met.

The central transaction involved in both Ernst & Young's fee application and the Trustee's present claim was the provision of accounting services during the Chapter 11 reorganization.  Fee awards for professionals employed by the bankruptcy estate are governed by 11 U.S.C. § 330.  The 1994 amendments to section 330, which became effective October 22, 1994, provide in part as follows:

---

primary right and duty or wrong is the same in each action. *See Kemp v. Birmingham News Co.*, 608 F.2d 1049, 1052 (5th Cir. 1979); *Stevenson v. International Paper Co.*, 516 F.2d 103, 109 (5th Cir. 1975).  This Circuit, however, sitting *en banc* in *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 560 n.4 (5th Cir. 1983), stated that the Restatement's transactional test "represents the modern view" and is preferable to the test enunciated in *Kemp*.

"In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
(A) the time spent on such services;
(B) the rates charged for such services;
(C) whether such services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title."
11 U.S.C. § 330(a)(3).

Accordingly, an award of fees for professionals, such as Ernst & Young, employed by a bankruptcy estate represents a determination of "the nature, the extent, and the value of such services." 11 U.S.C. § 330(a)(3); *see also In re Temple Retirement Community*, 97 B.R. 333, 337 (Bankr. W.D. Tex. 1989) ("[T]his court holds with numerous other courts that it 'has the independent authority and responsibility to determine the reasonableness of all fee requests, regardless of whether objections are filed.'") (citations omitted).

In fact, the bankruptcy court's preliminary remarks at the January 23, 1995 fee hearing reflect the importance of these factors in awarding fees to the professionals employed by IT, including Ernst & Young:

"Most of you who have been in this court before know that my primary interest is not such in the niggling auditing details of tenths-of-an-hour time reporting and so and so forth, although that's important. It's not so much focused on that as it is focused on the bigger picture. What sort of bang did the estate get for its buck? What kind of results did we get? Is the amount of the services—amount of fees charged for the nature of the services rendered given the results achieved reasonable? Turns out that's the standard that Congress has adopted in the new amendments to the Bankruptcy Code as well, so that gives me some comfort

9

that I might be on the right track." By granting Ernst & Young's fee application, the bankruptcy court implied a finding of quality and value in Ernst & Young's services. Similarly, the Trustee's claims in the present suit arise from Ernst & Young's alleged omissions in rendering the very same services considered by the bankruptcy court in the fee application hearing. The Trustee's malpractice claims, challenging the sufficiency and value of Ernst & Young's services, "inevitably involve[] the nature of the services performed for the debtor's estate and the fees awarded under superintendence of the bankruptcy court; [they] cannot stand alone." *In re Southmark Corp.*, 163 F.3d 925 at 931 (5th Cir.), *cert. denied*, 119 S.Ct. 2339 (1999).

Therefore, we conclude that the award of professional fees and the Trustee's malpractice claims concern "the same nucleus of operative facts" and meet the transactional test. Accordingly, there is an identity of claims between the fee application hearing and this malpractice suit.

Although all four elements listed by the *Nilsen* court are present, our inquiry is not complete. Even if the two actions are the same under the transactional test, *res judicata* does not bar this action unless IT could and should have brought its malpractice claims in the former proceedings. *See In re Howe*, 913 F.2d at 1145; *D-1 Enterprises, Inc. v. Commercial State Bank*, 864 F.2d 36, 38 (5th Cir. 1989) ("Essential to the application of the doctrine of *res judicata* is the principle that the previously unlitigated claim could or should have been brought in the earlier litigation."). In this context, important factors in this

analysis include whether the fee hearing was an adversary proceeding or contested matter, the nexus between the order awarding Ernst & Young fees and the claims now being asserted, and "the amount of time that has elapsed since the case commenced." *In re Howe*, 913 F.2d at 1146 n.28. None of these factors is a litmus test for the application of *res judicata*. *See id*. In the present context, "[t]he critical question for *res judicata* purposes is whether the party could or should have asserted the claim in the earlier proceeding." *Id*.

In reaching our determination, we consider whether and to what extent IT had actual or imputed awareness prior to the fee hearing of a real potential for claims against Ernst & Young such as those asserted by the Trustee and whether the bankruptcy court possessed procedural mechanisms that would have allowed IT to assert such claims. We believe so and affirm the lower courts' ruling that *res judicata* bars this action.

The Trustee argues that a fact issue exists as to whether IT was aware, prior to the January 23, 1995 fee hearing, of the basic facts underlying these malpractice claims, thereby precluding summary judgment on Ernst & Young's defense of *res judicata*. We disagree and find that IT was sufficiently aware of the real possibility of there being errors by Ernst & Young such as now alleged and of their likely consequences before the fee hearing.

The Trustee admits that the Board knew before the fee hearing that the figures prepared in part by Ernst & Young were inaccurate, but maintains that the Board had not yet had an opportunity to examine Ernst & Young's performance and had not reached a conclusion on the quality

11

of the services performed.  However, the summary judgment evidence clearly reveals that the Board had drawn a link between the inaccuracy in the cash flow projections and Ernst & Young's accounting services, as to the adequacy of which it at least had some question.

As the courts below noted, the Trustee's argument misses the point. *Res judicata* bars claims that should have been litigated in a previous proceeding.  *See Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1341 (5th Cir. 1996).      In *In re Howe*, 913 F.2d 1138 (5th Cir. 1990), we addressed a situation similar to the one presented in this suit.  The Howes, who had instituted voluntary Chapter 11 bankruptcy proceedings and negotiated a plan with their creditors, later brought lender liability claims against the primary creditors in the Chapter 11 proceedings.  *See id*. at 1140-41.  These creditors had filed proofs of claim on promissory notes and received allowed claims under the negotiated plan.  *See id*.  In challenging the application of *res judicata* to their claims, "[t]he Howes argue[d] that they should be allowed to pursue their claims because, although they may have been aware of the basic facts underlying their claims, they were not aware of the significance of those facts."  *Id*. at 1147.  We rejected this argument and found that *res judicata* barred the Howes' lender liability claims.  *See id*.

Like the Howes, IT had sufficient general awareness of the real potential for claims against Ernst & Young such as those here asserted. Although the Board may not have been aware of all the precise facts or reached a firm conclusion on Ernst & Young's performance, Collins's deposition reveals the following: prior to the fee hearing, the Board

12

knew the numbers were flawed and the Board "had some questions about whether the company got its money's worth for some of the professional fees." In addition, Collins's memorandum stated "that the sudden deterioration of the company's financial position raised questions as to the veracity of E+Y's audited numbers at the very time the company is being asked to pay them $218,000 in fees." According to Collins, this memorandum, which specifically referenced Ernst & Young, expressed "concerns about the quality of professional work" received by IT. These statements reveal that Collins, the Board, and Freeman had linked the flawed projections and the liquidity problem with the quality of Ernst & Young's services. Furthermore, Collins testified that in his mind IT "had every opportunity to address and consider the quality and nature of the fees requested by Ernst & Young."

Not only are Collins's statements revealing, but also the actions taken at the request of the Board evince an awareness of and focus on the general matters giving rise to the claims asserted in this suit. On the advice of Freeman, the Board decided to use its concerns as "a negotiating chip that [the Board] could have to get the fees reduced," rather than raise them as an objection to the fee applications. Freeman, as the negotiator, reported to the Board on January 18, 1995 that a fee reduction of $37,000 was reached in return for IT's unqualified support for Ernst & Young's fee application. After receiving this report, the Board sent Freeman to the fee hearing as IT's representative with the understanding that no objection regarding the quality of Ernst & Young's services would be raised, because the Board did not want the bankruptcy court to become aware of IT's liquidity

13

problem. Using concerns and questions about the quality of Ernst & Young's services as a bargaining chip in negotiating down the requested fee for the services and consciously deciding to forego raising these concerns at the fee hearing demonstrates that IT had at least ascertained that there was a realistic potential for the claims of the sort now being asserted by the Trustee. *See also Eubanks v. FDIC*, 977 F.2d 166, 174 (5th Cir. 1992).

Next, we consider whether the bankruptcy procedures afford an opportunity to litigate these claims effectively at the fee hearing. *See Hendrick v. Avent*, 891 F.2d 583, 586-87 (5th Cir. 1990); *D-1 Enterprises*, 864 F.2d at 40 (concluding that *res judicata* does not apply where the claim sought to be barred could not have been effectively litigated in the prior proceeding). The Trustee argues that these malpractice claims are counterclaims that could only be raised in an adversary proceeding, and that because the fee hearing was a contested matter, and not an adversary proceeding, these claims could not have been addressed at the fee hearing. We disagree.

We begin by recognizing that a fee application hearing is a contested matter in the bankruptcy context; however, the nature of the proceeding does not automatically determine whether this action is barred by *res judicata*. *See In re Howe*, 913 F.2d at 1146 n.28. Although the fee hearing was a contested matter, Ernst & Young's fee application was a claim against IT. *See* 11 U.S.C. § 101(5). Had IT objected to the fee application and included with its objection a claim for affirmative relief on account of alleged malpractice, the matter

14

would have become an adversary proceeding. *See* BANKR. R. 3007.[4]  In fact, the rule "provides no time limit for filing objections to claims," and the Trustee does not claim that the reorganization plan or the bankruptcy court imposed one.  9 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 3007.01[5], at 3007-7 (15th ed. 1983).  Furthermore, Bankruptcy Rule 9014, which governs contested matters, provides that "[t]he court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply."  BANKR. R. 9014; *see also* 10 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 7000, at 7000-1 (15th ed. 1983) ("Rule 9014 itself provides that certain of the rules in Part VII apply to contested matters and the court may direct that one or more other Part VII rules also shall apply.").  Part VII's rules are comparable to the Federal Rules of Civil Procedure.  *See id*. at ¶ 7000, at 7000-2.  Under Part VII, the bankruptcy court is to apply the Federal Rules of Civil Procedure governing discovery in adversary proceedings.  *See* BANKR. R. 7026-37.  Thus, even if IT had only informed the bankruptcy court of its concerns and not immediately sought affirmative relief for malpractice, the bankruptcy court could have stayed the fee hearing and permitted time for discovery and development under the procedures available in Part VII of the Bankruptcy Rules.

Our conclusion that the fee hearing provided an effective forum for

---

[4]  Bankruptcy Rule 3007 provides as follows:
  "An objection to the allowance of a claim shall be in writing and filed.  A copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant, the debtor or debtor in possession and the trustee at least 30 days prior to the hearing.  If an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding."

15

IT to present its claims is mandated by the application of *res judicata* in our bankruptcy precedent. *See, e.g., In re Baudoin*, 981 F.2d 736, 744 (5th Cir. 1993) (ruling that *res judicata* barred lender liability claims based on loans that had been deemed allowed claims without objection in a previous bankruptcy); *Eubanks*, 977 F.2d at 174 (barring a lender liability action which could have and should have been brought as an objection to the lender's claim in a prior bankruptcy proceeding); *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 869 (5th Cir. 1984) (applying *res judicata* to bar a claim that could have been raised as an objection to a claim asserted in a previous bankruptcy reorganization). The proper result under applicable Texas state law parallels the one we reach. If Ernst & Young had brought suit in Texas state court to recover its fees and IT had not asserted its malpractice claims by way of counterclaim, then a subsequent suit by IT or its successor-in-interest would be barred by *res judicata*. *See Goggin v. Grimes*, 969 S.W.2d 135, 138 (Tex. App.—Houston[14th Dist.] 1998, no pet.); *CLS Associates, Ltd. v. A_____ B_____*, 762 S.W.2d 221, 224 (Tex. App.—Dallas 1988, no writ).[5]

This Court's holding in *In re Southmark*, 163 F.3d 925 (5th Cir. 1999), does not preclude our disposition in this case. Southmark, a Chapter 11 debtor, filed a malpractice action against Coopers & Lybrand

---

[5] In arguing against the application of *res judicata*, the Trustee analogizes to the payment of a fee bill without court approval as not barring a subsequent malpractice claim. Although *res judicata* does not apply in such a situation, that has no
bearing on this case. Unlike the facts in this case, in the Trustee's hypothetical there is neither any "judgment on the merits" nor any judicial proceeding whatever when one pays a fee bill directly. *Nilsen*, 701 F.2d at 558.

after Coopers & Lybrand had been ordered by the bankruptcy court to disgorge fees earned for the services that were the subject of the malpractice action. *See id*. at 928. We held that Southmark's claims were barred by *collateral estoppel*, but also adverted to the "interesting question" as to whether *res judicata* also barred Southmark's claims. *Id*. at 935. While noting many of the issues raised by the parties in this case, we ultimately reserved judgment as to whether *res judicata* can apply to bankruptcy proceedings such as a fee hearing or a disgorgement hearing. *See id*. ("Enough has been said to dispel the notion that claim preclusion is *obviously* applicable here.") (emphasis added). Although it may not be obvious that *res judicata* bars the Trustee's claims here, we conclude that it does.

The Trustee suggests that, if *res judicata* is found to bar these malpractice claims, every bankruptcy debtor will be forced to object to all fee applications to prevent the application of this doctrine. We disagree. The particular facts of this case direct our decision: the Board's general awareness of the background facts underlying the present claims before the fee hearing, the Board's having realized the real possibility of a link between its flawed numbers and Ernst & Young's services, the Board's deliberate choice not to voice its concerns regarding the quality of services at the fee hearing,[6] and the bankruptcy court's order awarding fees to Ernst & Young.

---

[6]We do not suggest that the absence of such factors would preclude giving *res judicata* effect to a prior court judgment awarding recovery for personal or professional service; we speak here only to the context of a bankruptcy court contested matter order, where in our view some level of actual or constructive awareness on the part of the party sought to be so barred by the order properly carries a greater significance than it might in other contexts.

CONCLUSION

As the Trustee's claims against Ernst & Young are barred by *res judicata*, we need not address whether *collateral estoppel* or waiver also bar his claims.  For the reasons stated, the judgment below is AFFIRMED.