# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 11, 2009

Charles R. Fulbruge III
Clerk

No. 08-50677

In The Matter Of: THE NATIONAL BENEVOLENT ASSOCIATION OF THE CHRISTIAN CHURCH (DISCIPLES OF CHRIST), ET AL, Reorganized Debtors

Debtor

------------------------

THE NATIONAL BENEVOLENT ASSOCIATION OF THE CHRISTIAN CHURCH (DISCIPLES OF CHRIST), ET AL, Reorganized Debtors

Appellant

v.

WEIL, GOTSHAL & MANGES, LLP

Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No: 5:07-CV-379

Before WIENER, DENNIS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

The district court dismissed the debtor-appellant National Benevolent Association of the Christian Church (Disciples of Christ) ("NBA")'s malpractice

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

claims against appellee law firm of Weil, Gotshal & Manges, LLP ("Weil Gotshal") on *res judicata* and estoppel grounds. NBA appealed from that dismissal. Weil Gotshal then filed in this court a motion to dismiss for lack of subject-matter jurisdiction. We now vacate the district court's dismissal of NBA's claims but grant Weil Gotshal's motion to dismiss this case for a lack of subject-matter jurisdiction. Accordingly, we dismiss NBA's claims without prejudice.

## BACKGROUND

Prior to filing for bankruptcy, appellant NBA owned and operated eleven senior-care facilities, three special-care facilities for individuals who are developmentally disabled, and four children's-care facilities. NBA also managed more than seventy adult low-income residential housing projects under a contract with the Department of Housing and Urban Development ("HUD").

NBA financed its facilities with bond debt. In 2003, it had outstanding variable-rate bond debt of approximately $63 million and fixed rate bonds of approximately $150 million. For each variable-rate bond issue, KBC Bank of New York ("KBC") issued a letter of credit to guarantee the payment of principal and interest on those bonds. UMB Bank ("UMB") served as the master trustee for NBA's bond and bank debt. Further, NBA maintained a revolving line of credit with the First Bank of St. Louis ("First Bank") (collectively "the Banks").

Between 1999 and 2003, NBA's annual revenues ranged from $123 million to $145 million but between 2000 and 2003, NBA suffered significant losses. Consequently, in 2003 NBA anticipated a review of its letters of credit by KBC; the letters were due for renewal on September 1, 2003. If NBA could not renew its letters of credit, the variable-rate bonds would be subject to a mandatory purchase funded with draws on the letters of credit. In short, NBA would be

2

obligated to repay KBC the entire amount on the letters of credit (approximately $63 million) over a period of eight quarters.

In spring of 2003, NBA hired Cain Brothers, a New York investment advisor, and defendant law firm of Weil Gotshal to advise on the upcoming review. Deryck Palmer was the partner-in-charge at Weil Gotshal, and he allegedly took charge of negotiations with the Banks and instructed NBA to cease all direct communications with the bankers. NBA also hired Huron Consulting Group ("Huron") to perform accounting and financial analysis.

In July 2003, KBC requested a written request for renewal, updated financials, and a proposed business plan from NBA. At about that time, Huron completed its initial evaluation of NBA's financial condition and submitted a proposed business plan to Weil Gotshal. Palmer allegedly nonetheless refused to give the Huron report to KBC unless KBC signed a confidentiality agreement.

Initially, KBC was willing to sign a confidentiality agreement but did not want to sign a provision that required KBC to use the information only to consider the restructure proposals. Nevertheless, KBC eventually signed the agreement on August 18, 2003. Palmer, however, allegedly refused to provide the Huron materials and, as a result, NBA missed the renewal deadline.

Immediately after the passing of the deadline, Palmer relented and provided KBC with the Huron report. However, NBA was already bound by the mandatory purchase provision. An effort to revoke the mandatory purchase was too late, and the first payment became due on December 1, 2003. Because of the mandatory purchase, donations to NBA slowed, its bond ratings were downgraded, and potential purchasers at its senior living centers demanded refunds of their deposits. Sales halted for several months.

3

By late September, Weil Gotshal, along with the other consultants, presented to the Banks the first and only restructure proposal for NBA, which proposed a 40% debt reduction. The Banks disagreed with the first proposal and imposed a condition on NBA before conducting further negotiations. The Banks required NBA to agree to hire third-party professional management to operate their senior living centers. The NBA Board discussed the proposal, but Palmer allegedly advised the Board that it could not legally delegate the operation to third-party professionals. On November 12, Palmer told one of the Banks' lawyers that NBA would not make the December 1st bond payment, the first payment pursuant to the mandatory purchase. On November 20, Palmer participated in a telephone conference among the various NBA officers and several consultants. Palmer, along with Tom Barry from Cain Brothers, advised the NBA Board not to make the December 1st payment. The Board followed Palmer's advice, and NBA did not make the first payment.

Despite NBA's refusal to make the payment, the Banks were still willing to renegotiate a debt restructure if NBA agreed to professional management in some capacity. However, Palmer allegedly represented to the Board and the Texas and Missouri Attorney Generals that the Banks were unwilling to permit debt restructuring and had "forced" NBA into Chapter 11 bankruptcy proceedings.

At a NBA Board meeting on January 4, 2004, Palmer allegedly predicted that, after filing for bankruptcy, adverse summary judgments would soon occur and put the Banks in a position to forcibly sell NBA's assets. Palmer predicted that NBA may face the appointment of a receiver. On January 9-10, 2004, Weil Gotshal made a PowerPoint presentation to the NBA board entitled "Chapter 11 Update and Strategies." The presentation offered a positive view of bankruptcy

and touted Cain Brothers, Weil Gotshal, and Huron's value to NBA. Weil Gotshal, however, allegedly never presented possible risks to bankruptcy, such as the loss of NBA's senior care centers.

NBA filed its bankruptcy petition on February 16, 2004. On June 1, 2004, Weil Gotshal made another proposal to the Banks offering a 20% debt reduction. The Banks rejected the proposal and informed NBA that the "starting point" for negotiations was the sale of the senior care living centers. An agreement was reached regarding the marketing and sale of the centers. The centers were eventually sold to Fortress Investments for $210 million.

On March 2, 2005, NBA's bankruptcy plan was confirmed. Creditors were paid from the sale of NBA's real estate, including all eleven senior living centers and its St. Louis headquarters, along with NBA's cash-on-hand and securities. HUD terminated its management arrangement with NBA in its seventy-plus residential housing projects, and the Attorney Generals of Texas and Missouri demanded the ouster of the President and the Board. Nevertheless, NBA exited the bankruptcy with significant assets, including $23.4 million in cash and marketable securities and five child-and special-care centers.

Professional fees from Weil Gotshal amounted to $34 million in a little over one year. The bankruptcy court scheduled a post-confirmation hearing in respect to Weil Gotshal's application for a professional fee award. Before the hearing but after the plan's confirmation, NBA filed an adversary action in the bankruptcy court against Weil Gotshal alleging legal malpractice for both pre- and post-petition conduct. By its own motion, NBA consolidated the adversary action with proceedings in respect to Weil Gotshal's final fee application. The bankruptcy court dismissed both pre-petition and post-petition malpractice claims on *res judicata* grounds and then granted Weil Gotshal's fee request after

a hearing. The district court affirmed the dismissal of both pre-petition and post-petition malpractice claims and affirmed the fee award. NBA now appeals only the dismissal of its pre-petition malpractice claims. NBA did not appeal the fee award or the dismissal of its post-petition malpractice claims.

NBA alleges that Palmer was negligent in respect to the confidentiality negotiations and in permitting NBA to miss the renewal deadline. NBA further asserts that Palmer failed to adequately inform NBA of the consequences of defaulting on the December 1st payment. NBA also alleges that Palmer should have known that filing for bankruptcy would likely result in a liquidation of NBA's assets to effect full payment to its creditors. Finally, NBA alleges that Palmer had advised the NBA board on these decisions and that the NBA board always followed his advice. NBA contends that Palmer's negligence created unnecessary professional fees and prevented NBA from reaching a more favorable out-of-court resolution and thereby avoiding bankruptcy. In its appellate briefs, NBA clearly states that its malpractice claims are based solely on Weil Gotshal's pre-petition conduct. NBA does not claim that Weil Gotshal was negligent in handling the bankruptcy. Thus, the malpractice claim does not challenge the law firm's conduct underlying Weil Gotshal's bankruptcy fee application.

While this case was pending on appeal, Weil Gotshal filed a motion to dismiss for lack of subject-matter jurisdiction based on an intervening Fifth Circuit case, *In re United Operating, LLC,* 540 F.3d 351 (5th Cir. 2008). We review *de novo* a question of subject-matter jurisdiction, and objections to the exertion of subject-matter jurisdiction can be raised at any time during the proceedings. *Sealed Appellant v. Sealed Appellee*, 130 F.3d 695, 697 (5th Cir.

6

1997). For the reasons below, we vacate the district court's judgment but grant Weil Gotshal's motion to dismiss for lack of subject-matter jurisdiction.

## DISCUSSION

In *In re United Operating,* we considered the question: what happens to a debtor and its claims upon entering and concluding reorganization under Chapter 11. We concluded that a debtor's claim can survive the reorganization as the reorganized debtor's claim "only if the plan of reorganization expressly provides for the claim's 'retention and enforcement by the debtor.'" 540 F.3d at 355 (quoting 11 U.S.C. § 1123(b)(3)(B)). Otherwise, the reorganized debtor has no standing to pursue the debtor's claims in federal court and the federal court would be deprived of subject-matter jurisdiction over those claims. *Id*. at 354-55 & n.1. "'After confirmation of a plan, the ability of the [debtor] to enforce a claim once held by the estate is limited to that which has been retained in the plan.'" *Id*. at 355 (alteration in original) (quoting *In re Paramount Plastics, Inc.*, 172 B.R. 331, 333 (Bankr. W.D. Wash. 1994)). "For a debtor to preserve a claim, the plan must expressly retain the right to pursue such actions. The reservation must be *specific and unequivocal*." *Id*. at 355 (internal citations and quotation marks omitted) (emphasis added). NBA contends that *United Operating*'s interpretation and application of §1123(b)(3)(B) does not bar its claims for two reasons: (1) *In re Intelogic Trace, Inc.,* 200 F.3d 382, 386 (5th Cir. 2000), authorizes its claims; and (2) reservations in the confirmation plan unequivocally and specifically reserve its pre-petition attorney malpractice claim against Weil Gotshal. We conclude that NBA's arguments are without merit.

In *Intelogic Trace,* we did not squarely address our subject-matter jurisdiction over the reorganized debtor's professional negligence claims against its bankruptcy accountants for post-petition, pre-confirmation conduct that were

7

filed after the plan's confirmation. 200 F.3d at 385-386. Nevertheless, we implicitly exerted subject-matter jurisdiction over the claims because we held that the claims were barred by *res judicata. See id.*; *Republic Supply Co. v. Shoaf,* 815 F.2d 1046, 1052 (5th Cir. 1987) ("[A] court by necessity has the authority to determine its own jurisdiction over the parties and subject-matter, and does so either tacitly or expressly, by rendering a judgment."). In *Intelogic Trace,* the parties' dispute arose over a reorganized debtor's failure to pay its accountant's court-ordered fee award for its work on the confirmed Chapter 11 plan. 200 F.3d at 385. The accountant filed a claim for the unpaid award with the bankruptcy court, but the reorganized debtor responded with allegations of bankruptcy-related malpractice and filed a suit for malpractice in Texas state court. *Id.* In short, the accountant sought to enforce the bankruptcy court's fee award but the reorganized debtor filed a bankruptcy-related malpractice claim to collaterally attack the order.

"A final decree closing the case after the estate is fully administered does not deprive the court of jurisdiction to enforce or interpret its own orders." *In re 350 Encinitas Invs., LLC*, No. 07-56623, 2009 WL 382428, at *1 (9th Cir. Feb. 17, 2009) (unpublished) (quoting Bankruptcy Rule 3022 advisory committee's note (1991)); *see also In re Millenium Seacarriers, Inc.,* 419 F.3d 83, 97 (2d Cir. 2005) ("Bankruptcy courts retain jurisdiction to enforce and interpret their own orders."). In *Intelogic Trace,* the reorganized debtor's state court suit that collaterally attacked the fee award was subject to the bankruptcy court's jurisdiction because "[f]ederal jurisdiction is proper where a claim brought in state court seeks to attack or undermine an order of a federal district court." *Baccus v. Parrish,* 45 F.3d 958, 960 (5th Cir. 1995). Accordingly, we had subject-

8

matter jurisdiction in *Intelogic Trace* because our decision merely protected a federal court's previous fee award against a collateral attack.

Consistent with our exertion of subject-matter jurisdiction in *Intelogic Trace*, we barred the state legal malpractice claims under the doctrine of *res judicata.* 200 F.3d at 391. We concluded that the malpractice claims were barred under *res judicata* because the bankruptcy court, in determining that fees should be awarded to the accountants for their services in the Chapter 11 proceedings, necessarily determined that the accountant's work was reasonable and not negligent. *Id.* at 386-91. "By granting [the professional's] fee application, the bankruptcy court implied a finding of quality and value in [the professional's] services." *Id.* at 387.

For our subject-matter jurisdiction analysis in this case, *Intelogic Trace* supports the proposition that a federal court can hear state court malpractice claims if they relate to, and thereby collaterally attack, a bankruptcy court's fee award; but *Intelogic Trace* does not provide a general legal basis to exert subject-matter jurisdiction over a reorganized debtor's malpractice claims in respect to a professional's pre-confirmation conduct that is not reserved in the confirmation plan and also unrelated to a bankruptcy ruling. *Cf. In re Smyth,* 273 F.3d 393 (5th Cir. Aug. 7, 2001) (unpublished) (applying *Intelogic Trace* to bar malpractice claims against a bankruptcy accountant for conduct during bankruptcy proceedings because of a previous fee award decision); *In re Iannochino*, 242 F.3d 36 (1st Cir. 2001) (finding debtor's claims of malpractice during bankruptcy barred by *res judicata* after the court's implicit finding of quality in the fee award); *Grausz v. Englander*, 321 F.3d 467, 471 (4th Cir. 2003) (exerting subject-matter jurisdiction over malpractice claims filed in state court that challenge the fee award for legal services during bankruptcy proceedings). *Intelogic Trace*,

9

which applies to collateral attacks against previous bankruptcy fee awards, is entirely consistent with *United Operating,* which applies to any of the debtor's pre-confirmation claims unrelated to the bankruptcy court's own orders.

Unlike the malpractice claim in *Intelogic Trace*, NBA's malpractice claim here is based on Weil Gotshal's alleged pre-petition malpractice that was unrelated to its legal services during the bankruptcy and the bankruptcy court's fee award. Consequently, 11 U.S.C. § 1123(b) as interpreted by *United Operating* compels the dismissal of NBA's claims for lack of subject-matter jurisdiction unless the confirmed plan specifically and unequivocally reserved these claims. *See United Operating,* 540 F.3d at 355. Therefore, the dispositive question is whether the plan specifically and unequivocally reserved the pre-petition malpractice claims. *Id.* NBA contends the plan reserves these claims in Sections 9.2 and 9.3. We conclude that the plan does not specifically and unambiguously reserve the claims.

Section 1.2.89 of the plan's "Definitions" section defines the capitalized term "Professional."[1] This definition is important for reading Sections 9.2 and 9.3. Section 1.2.89 states:

> *Professional* means a professional employed in the Bankruptcy Cases under 11 U.S.C. §§ 327 and 1103.[2]

Section 9.2 describes the general release of claims against professionals thus:

---

[1] The plan, in section 1.1, recognizes the difference between capitalized terms and non-capitalized terms. Section 1.1 notes that all capitalized terms are defined in the "Definitions" section or by the Bankruptcy Code and Rules.

[2] The pertinent statutory provision for hiring debtor's attorneys is 11 U.S.C. § 327. Under 11 U.S.C. § 327, the bankruptcy court must approve of the employment of professionals and determine that the professionals do "not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." 11 U.S.C. § 327(e); *see also id.* § 327(a).

The Debtors . . . shall release, and be permanently enjoined from any prosecution or attempted prosecution of, . . . their . . . advisors, professionals, except that any Professional required to seek and obtain approval for payment of a Professional Fee claim is excluded . . . [and] not released. . . . Notwithstanding any provisions in the . . . Plan to the contrary, NOTHING in the Plan or Confirmation Order shall be deemed to release or indemnify any current or former . . . Professional or firm for which the Debtors filed an application to employ as a Professional from any liability for any claims or causes of action which may be asserted by any of the Attorney Generals of any state or by the Reorganized Debtors.

Section 9.3 reads:

[T]he following claims shall be expressly reserved and not released: . . . (d) objections to professional compensation applications as well as any other claims, if any, by Debtors against their professionals . . . (g) claims, if any, regarding any Professional or relating to or arising from any Professional Fee Claim.

NBA's argument is premised on the contention that the terms "Professional" and "professional" in the plan should be read interchangeably and generically to include any attorney or law firm rendering services to the debtor regardless of whether the services were rendered during the bankruptcy proceedings or before.

Assuming *arguendo* that NBA's interpretation is reasonable and acceptable, it is not the only plausible or reasonable reading of the plan provisions. We "interpret the Plan[ ] using traditional tools of contractual interpretations." *In re Advisory Comm. of Major Funding Corp.,* 109 F.3d 219, 222 (5th Cir. 1997). The plan provisions may also be construed to reserve malpractice and other claims only in respect to a professional's employment in the bankruptcy case and its fee application. The reservations generally refer to the *Professionals'* actions during bankruptcy and/or in relation to a *Professional's*

fee application. *See, e.g., Copelin v. Spirco, Inc.,* 182 F.3d 174, 183 (3d Cir. 1999) (reading language in the bankruptcy plan in the context of other provisions so as to determine the scope of a discharge provision). The plan defines "Professionals" as "a professional employed in the Bankruptcy Cases under 11 U.S.C. §§ 327 and 1103." It is reasonable to read the provisions as reserving only claims against Weil Gotshal in respect to post-petition conduct because Weil Gotshal only became a professional *employed in* the Bankruptcy Case *under 11 U.S.C. §§ 327 and 1103* after the petition for bankruptcy was filed and after the bankruptcy court had approved of its employment as a professional in the bankruptcy case. *See* 11 U.S.C. § 327. This reading also accords with the first part of Section 9.2, which specifically states that: "The Debtors . . . shall release, and be permanently enjoined from any prosecution or attempted prosecution of, . . . their . . . advisors, *professionals,* except that any *Professional* required to seek and obtain approval for payment of a Professional Fee claim is excluded . . . [and] not released." (emphasis added). This statement appears to indicate an intent to reserve claims against "Professionals" in respect to their conduct related to the bankruptcy proceedings and not claims against "professionals" generally. *See, e.g., Brown v. Fin. Serv. Corp., Int'l,* 489 F.2d 144, 151 (5th Cir. 1974) (describing the general rule of contractual interpretation that "conflicting provisions should be reconciled in order to give meaning to all parts of the contract.").

We need not decide which is the true or preferred interpretation of the plan's provisions in order to decide the present case. We merely conclude that the plan's provisions do not specifically and unequivocally reserve to NBA the right to prosecute its claim against Weil Gotshal arising out of the alleged attorney malpractice conduct that occurred prior to the NBA bankruptcy petition

12

filing and proceedings. *See United Operating,* 540 F.3d at 355. Accordingly, NBA, as the reorganized debtor, has no standing to pursue these claims in federal court. For these reasons we vacate the district court's judgment but grant Weil Gotshal's motion to dismiss this case for lack of subject-matter jurisdiction without prejudice.

**VACATED AND DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION.**