**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 98-30991
_____

MARGUERITE LEWIS HAWKING

Plaintiff

versus

FORD MOTOR CREDIT CO.; ET AL

Defendants

_____

FIDELITY NATIONAL BANK

Plaintiff

versus

CONSOLIDATED LEWIS INVESTMENT CORP

Defendant - Counter
Claimant - Appellant -
Cross Appellee

and

MARGUERITE LEWIS HAWKING; ARTHUR CULLEN
LEWIS, III; ALEXIS VOORHIES LEWIS; PATRICIA
ANN LEWIS WILLIAMS

Defendants - Counter
Claimants - Cross
Appellees

versus

FORD MOTOR CREDIT CO.

Defendant - Counter
Defendant - Appellee -
Cross Appellant

_____

In the Matter of: CONSOLIDATED LEWIS INVESTMENT CORP.

Debtor.

FORD MOTOR CREDIT CO.

                                        Appellee - Cross
                                        Appellant

versus

MARGUERITE LEWIS HAWKING; ARTHUR CULLEN
LEWIS, III; ALEXIS VOORHIES LEWIS; PATRICIA
ANN LEWIS WILLIAMS

                                        Cross Appellees

and

CONSOLIDATED LEWIS INVESTMENT CORP.

                                        Appellant - Cross
                                        Appellee
                    _____

           Appeals from the United States District Court
                for the Middle District of Louisiana

                    _____

                         May 4, 2000

Before GARWOOD, WIENER, and DENNIS, Circuit Judges.

WIENER, Circuit Judge:

     At the core of this appeal is the question whether Appellee-

Cross Appellant Ford Motor Credit Corporation ("FMCC"), a

commercial lender, can be held liable for the alleged fiduciary

breach of a trustee who, purporting to act in his capacity as

trustee, took out a loan on behalf of the trusts under his control,

and then allegedly used the loan proceeds to satisfy his personal

debts.  We conclude that Appellant-Cross Appellee Consolidated

Lewis Investment Corporation - Limited Partnership ("CLIC-LP"), a

Louisiana partnership in comendam that was formed to manage the

                              2

trusts' affairs, has not come forward with evidence sufficient to create a genuine issue of material fact regarding whether, at the time it closed the loan in question, FMCC either knew or should have known that the trustee was planning to breach his fiduciary duty to the trusts. We therefore affirm the district court's grant of summary judgment in favor of FMCC.

In its cross-appeal, FMCC asks us to review of the bankruptcy court's order remanding claims by the former beneficiaries of the trusts individually. As we lack jurisdiction over appeals from such remand orders of the bankruptcy court, we dismiss FMCC's cross-appeal.

## I.

### FACTS AND PROCEEDINGS

A.   Factual Background

Arthur C. Lewis, Jr. ("Lewis") was a real estate developer in Baton Rouge, Louisiana. In 1962 his mother, Ida Lewis, settled four trusts (the "Trusts"), one each for the benefit of one of Lewis's four children (her grandchildren), namely: Marguerite Lewis Hawking; Arthur Cullen Lewis, III; Alexis Voorhies Lewis; and Patricia Ann Lewis Williams (the "Lewis heirs"). She appointed Lewis as trustee of each trust.

With the exception of the identity of the beneficiary, the trust instruments are identical: Each empowered Lewis to borrow

3

funds on its behalf and to pledge trust assets as collateral.[1] Lewis managed the Trusts' assets collectively, as though the four Trusts were one. In 1980, Lewis approached FMCC seeking a loan on behalf of the Trusts. FMCC performed extensive "due diligence" investigation which included confirming that Lewis was authorized to borrow and receive funds on behalf of the Trusts and to encumber Trust property as security for such loans; that Lewis was an "influential and prosperous property owner who has consistently maintained a good credit record," and about whom FMCC's investigation "revealed no derogatory information"; that the Trusts' combined net worth was $36 million; and that Lewis had a personal net worth of $28 million.

After completing its due diligence, FMCC submitted a

---

[1]Each trust instrument provides:

¶2.2. Without limitation upon any of the TRUSTEE'S other powers given by law or by other provisions of this instrument, and by way of illustration only, the TRUSTEE is specifically given the power to do all of the following acts from time to time in his discretion, and without order or license of the Court:

\* \* \*

¶2.9. To borrow money and, if the TRUSTEE sees fit, to give security for such funds as may be borrowed in such fashion as the TRUSTEE may see fit by mortgage, pledge, or otherwise and, in connection with any security which may be given, to give security for funds borrowed for a term which may extend beyond the term of the trust. The TRUSTEE may borrow money to be used for the joint benefit of the beneficiary of this trust and for the benefit of the beneficiaries of similar trusts, the corpus of which consists of undivided interests of the same property as the corpus of this trust . . . .

commitment letter to Lewis as trustee offering to make a $2.23 million loan to the Trusts. As proposed, the loan was to be an <u>in rem</u> obligation of the Trusts, secured by collateral mortgages on specified immovable property ("real estate") owned by the Trusts. Acting in his capacity as Trustee, Lewis formally accepted FMCC's proposal. To provide additional security to FMCC, Lewis and his wife personally guaranteed the loan.

Prior to closing, Lewis assured FMCC, in writing, that "[t]he proceeds of these loan funds will be applied to the reduction of outstanding bank obligations <u>owed by the Trusts</u>," and the Trusts' attorney gave FMCC an opinion letter confirming that the loan "has been duly authorized" and that the proceeds, "when delivered, will constitute [a] valid and legally binding obligation[] of" the Trusts. The loan was closed on December 29, 1980, and the loan proceeds were then disbursed in accordance with the written instruction of Lewis as Trustee.

Almost two years after the loan was closed, on October 7, 1982, Lewis effected a transfer of all real estate owned by the Trusts to the newley-formed CLIC-LP. Trust properties mortgaged to secure FMCC's <u>in</u> <u>rem</u> loan were transferred to the partnership subject to those encumbrances. Each Trust received a limited partnership interest in exchange for the real estate it had transferred. The general partner of CLIC-LP was a Louisiana corporation of which Lewis was president. In that capacity he had

5

essentially the same control of the properties as he had when he served as trustee of the Trusts. After this transfer, all periodic loan payments to FMCC were made by CLIC-LP on behalf of the Trusts.[2] In June 1983, CLIC-LP repaid the loan in full. FMCC released its lien on the subject properties and released Lewis and his wife from their personal guarantees.

In July 1985, Lewis died; in September 1986, his wife died. Pursuant to an express provision of the trust instruments the Trusts terminated at the death of Lewis's wife and all remaining property of the Trusts was distributed to the respective beneficiaries. As a result, the Lewis heirs, all majors, became direct owners of the CLIC-LP limited partnership shares that had formerly been held in trust for their benefit.

B.  Procedural History

After Lewis died, Fidelity National Bank of Baton Rouge ("Fidelity") filed suit in Louisiana state court against, inter alia, Lewis's succession, the Lewis heirs, and CLIC-LP. The suit was brought to collect outstanding debts that had been incurred, guaranteed, or succeeded to by the various defendants. Shortly thereafter, CLIC-LP filed for Chapter 11 bankruptcy protection.

More than one year after Fidelity filed its state-court action, and after CLIC-LP had filed for Chapter 11 bankruptcy,

_____

[2]The loan was an interest-only (i.e., non-amortizing) loan; therefore, CLIC-LP made a portion of the interest payments (those coming due after the transfer) and it repaid the full principal balance, or "balloon," when it became due.

6

CLIC-LP amended its responsive pleading in the state-court action that had been commenced against it by Fidelity. By the amendment, CLIC-LP asserted (1) a reconventional demand against Fidelity, (2) a cross-claim against Lewis's succession, and (3) a third-party demand against FMCC.[3] CLIC-LP alleged that Lewis, as trustee of the Trusts and as president of the corporate general partner of CLIC-LP, had borrowed substantial sums of money on behalf of the Trusts and the partnership but had used the loan proceeds for his own purposes and for other purposes not in the best interests of CLIC-LP or the Trusts; that Lewis had commingled CLIC-LP's funds with his personal funds and funds belonging to the Trusts; and that Lewis had thereby violated both the CLIC-LP partnership agreement and his fiduciary duty as trustee.

CLIC-LP contended that both Fidelity and FMCC were solidarily liable with Lewis's succession for the damages that resulted from Lewis's malfeasance.[4] The gravamen of CLIC-LP's claim against FMCC was that FMCC knew —— or at least should have known —— that Lewis was planning to misuse the proceeds of FMCC's loan in violation of

---

[3]CLIC-LP also sued Hibernia National Bank as successor to Fidelity for Fidelity's alleged wrongdoing and also for Hibernia's own alleged transgressions. For clarity, we will refer to both entities as Fidelity.

[4]CLIC-LP alleged that Fidelity knew or should have known that Lewis was repeatedly commingling funds in his account at that bank and further that Fidelity encouraged this conduct to facilitate Lewis's repayment of his personal debts to Fidelity. CLIC-LP has settled with Fidelity; that controversy is not before us in this appeal.

7

his fiduciary duty.  And, CLIC-LP urged, because Lewis had breached his fiduciary duty to the trusts by pledging their assets to borrow money nominally for the trust but in fact for himself, the loan by FMCC was not a valid obligation of the Trusts.  Thus, reasons CLIC-LP, because the Trusts should never have been obligated to repay the loan, when they did so it constituted the "payment of a thing not due,"[5] making the repayment recoverable under the Louisiana Civil Code as a quasi-contractual obligation.

The claims asserted by CLIC-LP's amended pleading, if successful, would inure to the benefit of the bankruptcy estate, making these claims at least "related to" CLIC-LP's Chapter 11 bankruptcy.[6]  Thus, as a result of CLIC-LP's pleading amendment, the state-court action became removable to federal court pursuant to 28 U.S.C. §1452(a).[7]  Both Fidelity and FMCC removed the case to federal district court and the district court referred it, as an adversary proceeding, to the bankruptcy court overseeing CLIC-LP's Chapter 11 bankruptcy.  (While the adversary proceeding was pending in the bankruptcy court, CLIC-LP and the Lewis heirs settled with Fidelity.)

_____

[5]See La. Civ. Code art. 2301 et seq.

[6]See 28 U.S.C. §1334(b); Randall & Blake, Inc. v. Evans, 196 F.3d 579 (5th Cir. 1999).

[7]28 U.S.C. §1452(a) provides: "A party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of [Title 28]."

8

After years of delay and extensive procedural wrangling, which we need not recount for purposes of this appeal, FMCC amended the answer it had filed in response to CLIC-LP's third-party demand. By this amendment, FMCC added, inter alia, (1) a counterclaim against CLIC-LP and (2) a third-party demand against the Lewis heirs. FMCC sought a declaratory judgment decreeing who between the Lewis heirs and CLIC-LP owned the cause of action against FMCC, assuming any cause of action had been stated. By joining all potential claimants, FMCC was attempting to avoid the risk of inconsistent verdicts and multiple liability that might attend piecemeal litigation.

Ultimately the bankruptcy court issued one judgment and one report and recommendation. In its judgment, the bankruptcy court ruled first that if any cause of action against FMCC exists in favor of CLIC-LP and the Lewis heirs, it consists of two separate claims: (1) a claim of the former beneficiaries of the previously-expired Trusts, i.e., the Lewis heirs, for any damages incurred prior to October 7, 1982, the date on which the Trusts transferred their real estate to CLIC-LP; and (2) a claim of CLIC-LP for any damages incurred from that date forward. Second, the bankruptcy court severed the Lewis heirs' pre-October 1982 claim from CLIC-LP's post-October 1982 claim and remanded the heirs' claim to the state court from which the lawsuit initiated there by Fidelity had been removed. The bankruptcy court held in the alternative that it

9

would abstain from further proceedings regarding the Lewis heirs' pre-October 1982 claim.

In its report and recommendation, the bankruptcy court recommended to the district court that it grant summary judgment in favor of FMCC and dismiss CLIC-LP's complaint. The district court adopted the bankruptcy court's report and recommendation and granted summary judgment in favor of FMCC. It also affirmed the bankruptcy court's judgment remanding the Lewis heirs' claims against CLIC-LP, or in the alternative, abstaining from exercising jurisdiction over those claims. CLIC-LP timely appealed the district court's grant of summary judgment, and FMCC cross-appealed that court's remand and alternative abstention, arguing that the bankruptcy court erred reversibly by severing the cause of action brought by CLIC-LP into two claims and remanding one of them, the Lewis heirs' claim, to state court.

## II.

## ANALYSIS

A.   Jurisdiction & Standard of Review

We have jurisdiction over appeals from final judgments of the district courts in bankruptcy cases under 28 U.S.C. §158(d). We review the district court's grant of summary judgment de novo.[8]

B.   Summary Judgment Burden

---

[8]See Interlogic Trace, Inc. v. Ernst & Young, LLP, 200 F.3d 382, 386 (5th Cir. 2000).

10

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . and the moving party is entitled to judgment as a matter of law."[9]  All inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party,[10] here CLIC-LP.  If, however, the evidence submitted by the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted[11] because "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine' issue for trial."[12]  Finally, once a motion for summary judgment has been made and supported the party opposing the motion "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."[13]

Even though in this case federal jurisdiction is grounded in

_____

[9]Fed. R. Civ. P. 56(c).

[10]See, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473 (1962).

[11]See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

[12]Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-89 (1968)).

[13]Fed. R. Civ. P. 56(e).

11

bankruptcy, resolution of the adversary claims between CLIC-LP and FMCC depends on construction of Louisiana law. Jurisdiction is not at issue so the first step in our summary judgment review is to isolate the relevant legal principles of Louisiana law.[14] Once we have narrowed the legal inquiry, which in turn will enable us to identify those facts that are material, our second step will be to determine whether, as the bankruptcy and district courts found, CLIC-LP has failed to make a showing sufficient to establish the existence of an element essential to its case. "[I]n such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerting an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[15]

C.   CLIC-LP's Arguments

CLIC-LP's first argument can be disposed of quickly as it is based on a fallacious notion of the judicial function. CLIC-LP suggests that between the Lewis heirs, who it says were completely innocent and unaware of Lewis's alleged fiduciary breach, and FMCC, which it says could have (and, the heirs assert, should have) ascertained that Lewis was planning to breach his fiduciary duty,

_____

[14]See generally, Songbird, Inc. v. Bearsville Records, Inc., 104 F.3d 773, 776-77 (5th Cir. 1997) (detailing special Erie considerations necessary when a federal court applies Louisiana law).

[15]Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (5th Cir. 1986).

12

FMCC is the more culpable and therefore should bear the loss resulting from Lewis's alleged misconduct.  We are not, however, free to settle accounts among litigants based solely on our subjective sense of what is "just"; rather, our task is to apply the law.  We therefore reject CLIC-LP's suggestion that, as the least-culpable party, it is entitled to recover.

CLIC-LP next urges that, under Louisiana law, its repayment of the $2.23 million loan constituted "payment of a thing not due" entitling it to repayment from FMCC.  But CLIC-LP misapprehends the legal doctrine on which it relies.

The articles governing the payment of a thing not due are found in Title V of Book III of the Civil Code, articles 2031- 2314.[16]  CLIC-LP rests its argument on the first two of these articles:

> **Art. 2301.**  He who receives what is not due to him, whether he receives it through error or knowingly, obligates himself to restore it to him from whom he has unduly received it.

> **Art. 2302.**  He who has paid through mistake, believing himself a debtor, may reclaim what he has paid.

By its plain terms, article 2301 imposes the obligation to restore only on one who has received what "is not due to him."  And, to recover under article 2302, the claimant must have paid "through mistake."  Consequently, if (1) there was a valid obligation,

---

[16]These articles were revised by Acts 1995, No. 1041, §1, eff. January 1, 1996.  The pre-revision articles would, if applicable, govern this case.  See La. Civ. Code art. 6.

13

making the loan payments received by FMCC something other than a payment that "is not due to [it]," and (2) the loan payments by CLIC-LP were made other than "through mistake," these Code articles are not even potentially applicable.

As we understand CLIC-LP's argument, its "mistake" was the erroneous conclusion that the Trusts (and therefore CLIC-LP as successor of the Trusts)[17] were contractually bound to repay the loan. Thus the applicability of the above-quoted Civil Code articles turns on whether the Trusts owed a legal obligation to FMCC. If such an obligation existed, then as a matter of law FMCC could not have received a thing not due, so CLIC-LP could not have paid through mistake. This would render both article 2301 and 2302 inapplicable. Indeed, under the circumstances, CLIC-LP's only recourse would be against the Succession of Lewis, the party who benefitted from the loan proceeds.[18]

To support its assertion that it was not obligated to repay the loan, CLIC-LP refers us almost exclusively to cases construing the Louisiana Business Corporations law.[19] These cases stand for the unexceptional proposition that when an agent purports to act on

---

[17]CLIC-LP has never sought to recoup its repayment of the loans on the ground that the Trusts, not CLIC-LP, was the true obligor; CLIC-LP acknowledges that when it repaid FMCC it did so as successor to and on behalf of the Trusts.

[18]See La. Civ. Code art. 2310 (1995); LEVASSEUR, LOUISIANA LAW OF UNJUST ENRICHMENT AND QUASI-CONTRACTS 168 (1991).

[19]See La. Rev. Stat. §12:1 et seq.

14

behalf of a corporation, but in so doing exceeds the scope of his mandate — acts _ultra vires_ — the agent does not bind the corporation.[20]

CLIC-LP would have us liken Lewis to the corporate agents in these cases, suggesting that because Lewis had no authority to pledge trust assets to secure his personal obligations, his act — signing the loan documents in his capacity as trustee — was _ultra vires_. CLIC-LP thus concludes that neither it nor the Trusts were ever obligated to repay the loan.[21]

What CLIC-LP fails to recognize is that, unlike the corporate agents in the cases it cites, Lewis had _actual_ authority to borrow money on the Trusts' behalf. The Trust instruments could not have been clearer in this regard, expressly empowering Lewis "to borrow money and, if [Lewis] sees fit, to give security for such funds as

---

[20]_See_, _e.g._, _Buckley v. Woodlawn Development. Corp._, 98 So. 2d 92 (La. 1957); _Jones v. Shreveport Lodge No. 122, B.P.O.E._, 60 So. 2d 889 (La. 1952); _Lilliedahl & Mitchel, Inc. v. Avoyelles Trust & Savings Bank_, 352 So. 2d 781 (La. App. 3d Cir. 1977).

[21]CLIC-LP also relies on two cases construing La. Civ. Code art. 2301, _Roney v. Payton_, 159 So. 469 (La. App. 1935) and _Smith v. Phillips_, 143 So. 47 (La. App. 1932). In _Roney_, an agent paid a personal obligation with his principal's funds. The recipient of that payment was appraised of facts that "clearly showed" that an agent made the subject payment to satisfy his personal obligation and that the principal was not a party to the transaction. As discussed more fully in the context of CLIC-LP's third argument, neither of these facts can be shown here. Therefore we find _Roney_ distinguishable.

The _Smith_ case deals with the situation where one satisfies an obligation that was, at the time of the payment, valid, but that was later invalidated. If we were to accept CLIC-LP's argument, we would conclude that the obligation in this case was void _ab initio_. Thus, _Smith_ sheds no light on this case.

15

may be borrowed . . . by mortgage, pledge, or otherwise."[22]  On the summary judgment record before us, the evidence indicating that this was precisely the power that Lewis purported to exercise in his dealings with FMCC is overwhelming and uncontroverted.

This leads us to conclude that the Trusts were legally obligated to repay FMCC, so we are not faced with the payment of a thing not due, and articles 2301 and 2302 do not apply.[23]  To be sure, if the beneficiaries could show that Lewis abused his authority and his abuse rose to the level of a fiduciary breach, then the beneficiaries could recover against Lewis; it does not follow, however, that the beneficiaries could necessarily recover from FMCC as well.

CLIC-LP's third argument is that FMCC aided Lewis in breaching his fiduciary duty, and FMCC is therefore solidarily liable with Lewis's succession for the damages resulting from that breach. Louisiana law is not clear as to just what CLIC-LP would have to prove to recover from FMCC on this theory. The two possibilities are: (1) the standard set forth in the Louisiana version of the Uniform Fiduciaries Act, under which CLIC-LP would have to show that FMCC's actions were taken other than "in good faith"; and (2)

---

[22]The relevant provisions of the Trust instruments are set out more fully above.  See supra n.1.

[23]Accord McKinney Saw & Cycle v. Barris, 626 So. 2d 786, 790 (La. App. 1993) (holding that article 2302 has no application to where the payment in question was made to satisfy a valid judgment).

16

the majority common-law trust standard, under which CLIC-LP would have to show that, as one alleged to have aided the trustee in his breach, FMCC had either actual or constructive knowledge that the trustee was planning to commit a breach of trust.

Louisiana has adopted the Uniform Fiduciaries Act (the "Act"),[24] a statute that governs the potential liability of persons entering into specified transactions with a fiduciary. The general purpose of the Act is

> to establish uniform and definite rules in place of the diverse and indefinite rules now prevailing as to 'constructive notice' of breaches of fiduciary obligations. In some cases there should be no liability in the absence of actual knowledge or bad faith; in others there should be action at peril. In none of the situations here treated is the standard of due care or negligence made the test.[25]

CLIC-LP asserts that the Act does not apply here because FMCC is not a bank. Although some sections of that Act do apply only to transactions between banks and fiduciaries,[26] La. Rev. Stat. §9:3802, the provision that, if applicable, sets the standard against which FMCC's conduct vis-à-vis the trustee must be judged, expressly applies to any "person" — a term defined to include corporations (not just banks) — that transacts with a fiduciary. That section provides:

---

[24]La. Rev. Stat. §9:3801 <u>et seq.</u>

[25]Commissioner's Prefatory Note on Uniform Act, reprinted in the Louisiana Revised Statutes annotated volumes directly before La. Rev. Stat. §9:3801.

[26]<u>See, e.g.</u>, La. Rev. Stat. §9:3807.

> A person who in <u>good faith pays or transfers to a fiduciary</u> any money or other property which the fiduciary as such is authorized to receive, is not responsible for the proper application thereof by the fiduciary; and any right or title acquired from the fiduciary is consideration of such payment or transfer is not invalid in consequence of a misapplication by the fiduciary.[27]

As detailed above, the fiduciary in this case (Lewis) was authorized to receive funds on behalf of the trust. Under the Act, therefore, FMCC's "is not responsible for the proper application" of the loan proceeds if FMCC acted "in good faith." Under the a Act, "[a] thing is done 'in good faith' . . . when it is in fact done honestly, whether it be done negligently or not."[28]

The Louisiana courts have not yet had occasion to put a judicial gloss on the phrase "good faith" in the context of the Act, but the language of the Act itself and case law from other jurisdictions — which are particularly persuasive authority when construction of a Uniform Act is at issue — indicate that the Act imposes a greater burden on the plaintiff in a suit to recover from one alleged to have aided a fiduciary in a breach-of-trust than does the common-law standard of actual or constructive knowledge.[29]

---

[27]La. Rev. Stat. §9:3202. This section is identical to §2 of the Uniform Fiduciaries Act, 7A Uniform Law Annotated, Maser Edition at506 (1999 Master Edition).

[28]La. Rev. Stat. §9:3801(5).

[29]<u>See, e.g.</u>, Bogert and Bogert, <u>The Law of Trusts and Trustees</u> §902 (1995) ("The Uniform Fiduciaries Act expressly denies the existence of a duty on the part of one paying money or delivering other property to the trustee to see to its application by the trustee."); <u>Trenton Trust Company v. Western Surety Co.</u>, 599 S.W.2d 481, 492 (Mo. 1980) (<u>en banc</u>) ("The mere failure to make inquiry,

18

It is therefore not surprising that CLIC-LP insists that we should apply the common-law standard. CLIC-LP maintains that if it can show that FMCC either knew or should have known that Lewis was planning to breach his fiduciary duty, then FMCC could be held liable for the damages that result from that breach. CLIC-LP has not cited any Louisiana jurisprudence adopting the common-law actual-or-constructive-knowledge standard and our independent research has revealed none. But CLIC-LP's assertion does comport with the general rule set forth in the Restatement (Second) of Trusts:

> If a third person pays or conveys to the trustee money or other property which the trustee as such is authorized to receive, and the trustee misapplies the money or other property, the third person is liable for participation in the breach of trust, if, but only if, when he made such payment or conveyance he had <u>notice</u> that the trustee was misapplying or intending to misapply the money or other property.[30]

A person is deemed to have "notice," under the Restatement, if "he <u>knows or should know</u> of the breach of trust."[31] The leading treatises state the general rule similarly.[32]

---

even though there may be suspicious circumstances, does not" indicate the absence of good faith as defined in the Act "unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction, that is to say, where there is an intentional closing of the yes or stopping of the ears.").

[30]RESTATEMENT (SECOND) OF TRUSTS §321.

[31]<u>Id.</u> at §297.

[32]<u>See</u> BOGERT & BOGERT, THE LAW OF TRUSTS AND TRUSTEES §901 (1995); FRATCHER, SCOTT ON TRUSTS §321 (1989).

19

Lacking adequate guidance in this area of state law, we will indulge, for the sake of argument, CLIC-LP's suggestion that the more liberal common-law standard applies. Under it, the appropriate inquiry is whether CLIC-LP has set forth specific facts showing that FMCC at least should have known that Lewis was planning to breach his fiduciary duty.

Two documents in the record are proffered by CLIC-LP as creating a genuine issue of material fact on this point. The first is a sixteen-page loan proposal summary, an internal FMCC memorandum that sets forth the terms of a proposed loan to the Trusts, detailing the creditworthiness of the borrower (the Trusts) and the guarantors (Lewis and his wife), and recommending approval of the loan. CLIC-LP maintains that, after reviewing this document, a fact finder could reasonably conclude that FMCC knew that the purpose of the loan was to pay off the debts of the "Lewis entities," and that Lewis habitually used the term "Lewis entities" in reference to all of the legal entities under his control — a universe that included businesses and properties in addition to those forming the Trusts' res.

Our scrutiny of this memorandum reveals that in the section summarizing the proposal, the purpose of the loan was clearly stated to be "[p]rovid[ing] funds to liquidate <u>Borrower's</u> short term debt with commercial banks."[33]   The Borrower is expressly

---

[33]Emphasis added.

identified as "Trust C - Arthur Cullen Lewis, Jr., Trustee." The loan memorandum also discusses the financial condition of Lewis's business affairs, including the financial wherewithal of enterprises other than the trust —— explaining the unremarkable reference to the "Lewis entities." As Lewis and his wife gave their personal guarantees it is only natural that FMCC would investigate all of Lewis's many business affairs.

The second document proffered by CLIC-LP in support of its position that FMCC should have known of Lewis's planned breach is a letter that Lewis sent to FMCC directing FMCC to wire the loan proceeds to "the account of A. C. Lewis, Jr., Account No. [omitted] with Fidelity[.]" The letter goes on to say that "[f]or and in consideration of the Loan made by [FMCC], the undersigned hereby authorizes, requests and directs [FMCC] shall not be held accountable for making the advance under the Loan to said account of A. C. Lewis, Jr." The letter is signed by Lewis "as trustee." By the terms of the letter, Lewis's hold harmless covenant is granted in consideration of FMCC's making the loan to the Trusts, not for disbursing the proceeds to the specified account.

Asking rhetorically why any borrower would send such a letter, CLIC-LP argues that a jury could reasonably infer from its contents that FMCC should have known that Lewis was planning to breach his fiduciary duty.[34] We note, however, that before it got this letter

---

[34]CLIC-LP cites to other facts which, it urges, could lead a rational fact finder to infer that FMCC should have known about

21

FMCC had received another letter from Lewis specifically declaring that "[t]he proceeds of these loan funds will be applied to the reduction of outstanding bank obligations owed by the Trusts."

FMCC adduced summary judgment evidence disputing the contention that it either knew or should have known that Lewis was planning to misapply the loan proceeds. This evidence consisted of affidavits from various FMCC personnel, including loan officers and the attorney representing FMCC in the subject transaction, stating that neither Lewis nor Lewis's agents ever told them or even gave them any reason to suspect that Lewis planned to breach his duty to the Trusts. In addition, FMCC submitted the affidavit of the attorney at law who represented Lewis in both personal and business ventures, including in his various representative capacities such as corporate president and trustee of the Trusts. Lewis's lawyer averred that Lewis never told him or even suggested that the proceeds of the loans would be used for anything other than payment of the Trusts' legitimate obligations. Further, Lewis's attorney swore that he had no independent knowledge (or even a suspicion) that Lewis intended to breach his fiduciary duty. The sworn statements of these witnesses stand uncontroverted.

Having carefully reviewed the summary-judgment evidence, we

---

Lewis's nefarious intentions. For example, CLIC-LP urges that because the loan was an in rem obligation of the Trusts, FMCC should have known of Lewis's plot. We find this "evidence" even more specious than that discussed in the body of this opinion, and question whether it is even relevant.

conclude, like the district and bankruptcy courts before us, that even when we view the evidence and reasonable inferences that can be drawn from it in the light most favorable to CLIC-LP, the record does not support the position advanced by CLIC-LP sufficiently to create a genuine dispute of material fact.[35]  As the Supreme Court has held, when evidence submitted by the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted[36] because "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine' issue for trial."[37]  We agree with the district court's grant of summary judgment to FMCC.

D.    FMCC's cross appeal

FMCC argues that the bankruptcy court abused its discretion when it remanded to state court the Lewis heirs' claims against FMCC, rather than disposing of those claims by granting summary judgment in FMCC's favor.  Unfortunately for FMCC, the statute authorizing that remand, 28 U.S.C. §1452(b), precludes appellate

---

[35]See Fontenot v. Upjohn Co., 780 F.2d 1190 (5th Cir. 1986) (Rubin, J.) ("Absent evidence, direct, circumstantial, or inferential, that would create a genuine issue of fact, and absent any suggestion concerning the utility of additional time for further discovery, the [summary judgment] motion should be granted.").

[36]See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

[37]Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-89 (1968)).

review of such orders in bankruptcy cases.[38]  As we do not have jurisdiction over the substance of FMCC's cross appeal, we must dismiss it.

### III.

### CONCLUSION

For the forgoing reasons, we affirm the district court's grant of summary judgment in favor of FMCC and dismiss FMCC's cross appeal challenging the bankruptcy court's disposition of the Lewis heirs' claims by remanding them to state court.

APPEAL AFFIRMED; CROSS APPEAL DISMISSED

---

[38]See Sykes v. Texas Air Corp., 834 F.2d 488 (5th Cir. 1987).

24